[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-10270
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 20, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 06-00358-CV-2-IPJ

INGRID REEVES,

Plaintiff-Appellant,

versus

C.H. ROBINSON WORLDWIDE, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 20, 2010)

Before DUBINA, Chief Judge, TJOFLAT, EDMONDSON, BIRCH, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON, and PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

We sit en banc to consider this claim of a hostile work environment under Title VII, 42 U.S.C. § 2000e-2(a)(1), and whether it was error for the district court to grant summary judgment to appellee C.H. Robinson Worldwide, Inc. ("C.H. Robinson"). After thorough review of the record, and reading the evidence in a light most favorable to appellant Ingrid Reeves, we conclude that there is sufficient evidence to present a jury question of disparate treatment. While the record is replete with evidence of general, indiscriminate vulgarity, there is also ample evidence of gender-specific, derogatory comments made about women on account of their sex. Accordingly, we reverse and remand.

I.

We take the evidence found in this summary judgment record in a light most favorable to Reeves. We recite the profane language that allegedly permeated this workplace exactly as it was spoken in order to present and properly examine the social context in which it arose. We do not explicate this vulgar language lightly, but only because its full consideration is essential to measure whether these words and this conduct could be read as having created "an environment that a reasonable person would find hostile or abusive." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

The essential facts in this unedifying record are these. From July 2001 to March 2004, Ingrid Reeves worked as a transportation sales representative in the Birmingham, Alabama, branch of the shipping company C.H. Robinson. She was responsible for sales and operations management for freight shipping. Among other duties, Reeves telephoned companies, set up sales appointments, and managed shipping freight from beginning to end. Her job was phone-intensive, requiring her to speak daily with carriers, truck drivers, customers, and dispatchers. Reeves was the only woman working on the sales floor, an open area structured into a "pod" of cubicles, with six male co-workers. The only other female employee in the Birmingham branch worked in the same building, but in an area separate from Reeves's "pod." Because there were no large barriers between the cubicles, Reeves could often hear the language of her male co-workers as they spoke over the phone or with each other. Reeves could also hear the central office radio that sat on a bookshelf near the "pod."

Reeves had previously worked on a container ship and in the Merchant Marines, and was no stranger to the coarse language endemic to the transportation industry. In fact, Reeves herself used generic swear words, such as "shit" or "damn," to express her frustration or anger. Nonetheless, she testified, there was language that her co-workers used at C.H. Robinson that was unusually offensive,

3

even compared to the curse words she heard in the Merchant Marines.

Much of this language, while incessant, vulgar, and generally offensive, was not gender-specific. Throughout her tenure at C.H. Robinson, Reeves frequently heard generally indiscriminate vulgar language and discussions of sexual topics. Her co-workers, she claimed, regularly used curse words such as "fuck," "fucker," and "asshole." They used the intensely offensive epithet "Jesus fucking Christ," and the terms "fucking asshole," "fucking jerk," and "fucking idiot." They also discussed sexual topics such as masturbation and bestiality.

Reeves, however, also identified a substantial corpus of gender-derogatory language addressed specifically to women as a group in the workplace. Her co-workers used such language to refer to or to insult individual females with whom they spoke on the phone or who worked in a separate area of the branch. Although not speaking to Reeves specifically, Reeves said that her male co-workers referred to individuals in the workplace as "bitch," "fucking bitch," "fucking whore," "crack whore," and "cunt."

Reeves's co-worker Scott Gagliardi frequently shouted the epithets "fucking bitch" or "fucking whore" after hanging up his phone. He also called one woman a "cunt." Indeed, Reeves's supervisor, branch manager David Mitchell, often referred to his female colleagues by the term "bitch." Among other examples

offered, he ordered Reeves to speak with "that stupid bitch on line 4," and described a former female colleague, Jackie Burt, as a "lazy, good-for-nothing bitch." Gagliardi, in turn, concluded a joke with the punch-line "fuck your sister, and your mother is a whore."

Nearly every day, Reeves's co-workers tuned the office radio to a crude morning show. Reeves claimed that this program featured, among other things, regular discussions of women's anatomy, a graphic discussion of how women's nipples harden in the cold, and conversations about the size of women's breasts. It also once advertised a "perverse" bikini contest. On one occasion, Reeves's co-worker Darryl Harris displayed a pornographic image of a fully naked woman with her legs spread, exposing her vagina, on his computer screen. Her co-workers also regularly sang songs about gender-derogatory topics.

Reeves's co-workers singled out Casey Snider, the only other female employee in the Birmingham branch, for gender-specific ridicule. In Reeves's earshot, albeit out of Snider's presence, branch manager Mitchell insulted Snider, saying "[s]he may be a bitch, but she can read." Gagliardi also referred to Snider as a "bitch" after she had left the room to use the bathroom. Reeves's co-workers openly discussed Snider's buttocks. Mitchell commented that "[s]he's got a big one," and Gagliardi likewise said that "[s]he's got a big ass."

According to Reeves, this offensive conduct occurred "on a daily basis." She testified that "if you were to pull out a calendar right now and I were to look at, you know, summer of 2001 to spring of '04, I could point at every day of the year that some of this behavior went on. It went on every day." She indicated that "this type of phrase, 'You fucking whore,' was commonplace."

Reeves testified that she objected frequently to the crude language, conduct, and radio station to her co-workers. Much of the time, she identified only a generally vulgar and offensive working environment. On occasion, however, she complained about gender-specific offensive behavior, too.

Thus, for example, when she heard offensive topics on the radio, Reeves would change the radio station, usually to the "classic rock station," sometimes "twice in one day." Reeves said that when her co-workers used generally offensive terms, she told them that their language was offensive, first orally and then by email. Reeves's co-workers' offensive behavior allegedly persisted unabated. She testified: "It was pretty obvious to me by this time that complaining to co-workers was not bringing about any results. . . . [N]othing would change." Indeed, on one occasion, apparently aware that their conduct offended her, Reeves's co-worker Gagliardi shouted to her, "Ingrid, better wear your earplugs tomorrow," so that a co-worker could behave "any way he liked" on his last day of work.

At least once, Reeves complained directly to a co-worker about his gender-specific offensive behavior. Reeves described confronting Darryl Harris when he displayed an explicit image of a naked woman exposing her vagina on his computer screen. Reeves testified that she saw the picture as she walked by Harris's desk from the copy machine. Reeves recalled her reaction: "I was really offended by that. I was really upset. And it was very humiliating to me. And I just remember like my hands were like shaking. And . . . I knew I needed to say something to him because I felt that if I didn't say something to him, then he would assume that it's okay." Reeves said that she turned to Darryl and told him that she "saw that image [he] had on [his] computer. It really is offensive. It ma[de] [her] really uncomfortable." Harris apologized.

Because her complaints to her co-workers proved futile, Reeves complained to her branch manager and supervisor, David Mitchell. Reeves explained, "[i]t was pretty obvious to me by this time that complaining to co-workers was not bringing about any results. So by about this time, my focus was on upper management." She thought that complaining to her branch manager was "reasonable because according to that sexual harassment sheet [of C.H. Robinson's policy], it said this is who you're supposed to talk to."

Reeves recalled complaining to David Mitchell on at least five separate

7

occasions. Again, Reeves complained about both non-gender-specific, but generally vulgar behavior, and gender-specific conduct, too. On July 5, 2001, Reeves's third day in the office, she first complained about Mitchell's use of a vulgar reference to a woman. Mitchell had been speaking with a Japanese customer on the telephone. Reeves recalled listening to Mitchell's frustration rising. He placed the call on hold, looked directly at Reeves, and told her to "talk to that stupid bitch on line 4." After Reeves spoke with the customer, she asked to speak with Mitchell in his office. In this one-on-one meeting, she explained that the language he had used made her "very uncomfortable." He apologized, but offered that "this is just the way I am, and you will just have to learn to ignore it." In a later gender-derogatory incident, after Mitchell and Gagliardi commented on Snider's buttocks, Reeves exclaimed, "I can't believe you just said that."

On February 1, 2002, Reeves complained about both gender-derogatory and indiscriminately sexual topics on the radio. After Reeves had brought her own radio to work to "drown out" the offensive radio station and her co-workers' language, her supervisor, Mitchell, emailed Reeves to ask her to stop playing her radio. Reeves responded to Mitchell, in writing, to complain that, among other things, the radio station regularly broadcasted shows on topics such as the size of women's breasts and "elderly people having sex." She also told Mitchell that her

8

co-workers discussed generally offensive subjects such as "naked women at a hotel." Although Mitchell promised that the office could switch to playing less offensive programming, two months later, when Reeves tried once again to turn down the offensive radio station, Mitchell asked her to "turn it back up a notch" so that he could listen.

Reeves formally complained about her co-workers' offensive language in two separate work evaluations. Mitchell admitted that, although he had promised to "pay closer attention" to the language in the office, it "did not stop." He conceded that he never reported her complaints about the offensive language in the office to the corporate office, although it had been his responsibility to do so. Mitchell testified that, as a manager, he had "special responsibilities" to "report any infractions or violations of [the sexual harassment policy] to [the] human resources department." Indeed, he acknowledged that as a manager/supervisor, he was "responsible for establishing and maintaining a climate in the workplace that allows all employees to do their job effectively." Reeves testified that the offensive language and conduct continued unabated. Mitchell "laughed at" the offensive language, which Reeves claimed "just encouraged it."

When complaints to Mitchell went unaddressed, Reeves contacted two C.H. Robinson executives, Director of Branch Operations Molly DuBois and Vice

President Timothy Manning, to set up a meeting during the course of their June 2002 visit to evaluate the Birmingham branch. Reeves explained it this way: "I had complained to my branch manager. I was fed up. Nothing was changing. So at that point, what was reasonable was to go above him, which I did." Prior to the executives' visit, Reeves spoke with Director DuBois over the telephone and complained generally to her about the "sexually offensive language and conversation in the office," and the offensive radio talk show.[1] Although Vice President Manning had promised to meet with Reeves during his visit to Birmingham, he never met with her "one on one." Reeves testified that she was "very disappointed" in the executives' visit, because "they never, ever brought [the topic of the offensive conduct] up again with [her], and nothing ever changed. Everything in the office continued day after day after day."

Reeves resigned from her position at C.H. Robinson on March 24, 2004. On February 23, 2006, she filed a complaint against C.H. Robinson in the United States District Court for the Northern District of Alabama, alleging that she had been subjected to a hostile work environment in violation of Title VII. On December 11, 2006, the district court granted C.H. Robinson's motion for

---

[1] DuBois admitted to talking with Reeves on the telephone about problems at C.H. Robinson, but testified that, while "anything's possible," she did not remember the content of the phone call.

summary judgment. In so doing, the court held that the offensive conduct was not motivated by Reeves's sex, because the derogatory language in the office was not directed at her in particular. The district court reasoned that because the language was used and the radio program was played in the presence of all employees, "both men and women were afforded like treatment," and Reeves was not "intentionally singled out for adverse treatment because of her sex." Ingrid Reeves v. C.H. Robinson Worldwide, No. 2:06-CV-358-IPJ, Slip Op. at 19-20 (N.D. Ala. Dec. 11, 2006) (quotation marks and citation omitted).

Reeves appealed and a panel of this Court reversed the district court's judgment, holding, among other things, that Reeves had presented a jury question about whether the offensive conduct was based on her sex. Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1148 (11th Cir. 2008). On May 29, 2009, we vacated this opinion and granted rehearing en banc. Reeves v. C.H. Robinson Worldwide, Inc., 569 F.3d 1290, 1290-91 (11th Cir. 2009).

II.

We review de novo an order granting summary judgment. Cruz v. Publix Super Markets, Inc., 428 F.3d 1379, 1382 (11th Cir. 2005). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that

11

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citations and quotation marks omitted). We construe the evidence in a light most favorable to the non-moving party. St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC, 572 F.3d 893, 897 (11th Cir. 2009). Here, we read the evidence in a light most favorable to Reeves.

We begin by reiterating several core principles of employment discrimination law: first, to prove a hostile work environment under 42 U.S.C. § 2000e-2(a)(1), a plaintiff must show that her employer discriminated because of her membership in a protected group, and that the offensive conduct was either severe or pervasive enough to alter the terms or conditions of employment; second, Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment; third, workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context; and fourth, a plaintiff can prove a hostile work environment by showing severe or pervasive discrimination directed against

12

her protected group, even if she herself is not individually singled out in the offensive conduct.

Title VII of the Civil Rights Act prohibits employers from discriminating in the workplace on the basis of an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The statute and accompanying case law organize discrimination into two categories. In disparate treatment, an employer discriminates against a worker "with respect to his compensation, terms, conditions, or privileges of employment, because of" the individual's membership in a protected category. Id. § 2000e-2(a)(1). Disparate treatment can take the form either of a "tangible employment action," such as a firing or demotion, or of a "hostile work environment" that changes "the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1245 (11th Cir. 2004). Disparate impact, in contrast, involves "facially neutral employment practices that have significant adverse effects on protected groups . . . without proof that the employer adopted those practices with a discriminatory intent. . . . The evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986-87 (1988) (internal citations omitted).

13

"The doctrine seeks the removal of employment obstacles, not required by business necessity, which create 'built-in headwinds' and freeze out protected groups from job opportunities and advancement." EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274 (11th Cir. 2000) (quoting Griffin v. Carlin, 755 F.2d 1516, 1524 (11th Cir. 1985)).

At issue today is whether the conduct alleged to have pervaded C.H. Robinson created a hostile work environment that "exposed [Reeves] to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed." Oncale, 523 U.S. at 80 (quoting Harris, 510 U.S. at 25 (Ginsburg, J., concurring)). Accordingly, Reeves's case is properly read under the disparate treatment framework.[2]

---

[2] There has been some confusion about whether this case is one of disparate treatment or disparate impact. This confusion may have originated in the plaintiff's complaint: it neither classified the action as disparate treatment, nor identified the specific statutory section under which C.H. Robinson could be held liable (instead referring generally to "Title VII of the Civil Rights Act of 1964 ('Title VII'), 42 U.S.C. § 2000e et seq., as amended." Complaint at ¶ 6, Ingrid Reeves v. C.H. Robinson Worldwide, Inc., Case No. 2:06-CV-358-IPJ (N.D. Ala. Feb. 23, 2006)). We reiterate that disparate treatment under 42 U.S.C. § 2000e-2(a)(1) is the proper framework under which to evaluate hostile work environment claims. See, e.g., Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1301-02 (11th Cir. 2007); Henson v. City of Dundee, 682 F.2d 897, 902 (11th Cir. 1982). Under this framework, sexual harassment violates Title VII if it is "sufficiently severe or pervasive to alter the terms and conditions of work." Baldwin, 480 F.3d at 1300. The hostile work environment that Reeves has described was not "facially neutral." She has alleged, among others, that the office environment was permeated with gender-derogatory slurs and other demeaning, gender-specific conduct. The crux of Reeves's actionable claim is that these gender-specific actions exposed her to humiliation and discrimination that none of her male co-workers faced. She presented evidence of "specific incidents," not "statistical disparities." See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986-87 (1988).

14

The legal standard for hostile work environment claims in this Circuit is well-settled. To prove a hostile work environment, the plaintiff must show

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citation omitted). "Workplace conduct is not measured in isolation." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam). Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances. Mendoza, 195 F.3d at 1242.

Either severity or pervasiveness is sufficient to establish a violation of Title VII. See, e.g., Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 743 (1998) (noting that hostile work environment claims "require[] harassment that is severe or pervasive") (emphasis added). In evaluating allegedly discriminatory conduct, we consider its "frequency . . . ; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23, quoted in Mendoza, 195 F.3d at 1258 (Tjoflat, J., concurring in part, and dissenting in part).

15

Moreover, the plaintiff must prove that the environment was both subjectively and objectively hostile. Id. at 21-22. "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza, 195 F.3d at 1246 (quoting Harris, 510 U.S. at 21-22). "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." Harris, 510 U.S. at 22 (citation omitted). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale, 523 U.S. at 81 (quoting Harris, 510 U.S. at 23).

In a case like this, where both gender-specific and general, indiscriminate vulgarity allegedly pervaded the workplace, we reaffirm the bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII. Although gender-specific language that imposes a change in the terms or conditions of employment based on sex will violate Title VII, general vulgarity or references to sex that are indiscriminate in nature will not, standing alone, generally be actionable. Title VII is not a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale, 523 U.S. at 80). As we

16

observed in <u>Baldwin v. Blue Cross/Blue Shield of Alabama</u>, "Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex." 480 F.3d at 1301-02. Indeed, as the Supreme Court observed in <u>Oncale v. Sundowner Offshore Services, Inc.</u>, Title VII

> does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.

523 U.S. at 81.

In particular, sexual language and discussions that truly are indiscriminate do not themselves establish sexual harassment under Title VII. The Supreme Court has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." <u>Id.</u> at 80. Title VII's test instead is whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." <u>Id.</u>

17

(quoting <u>Harris</u>, 510 U.S. at 25 (Ginsburg, J., concurring)).[3]

Nevertheless, a member of a protected group cannot be forced to endure pervasive, derogatory conduct and references that are gender-specific in the workplace, just because the workplace may be otherwise rife with generally indiscriminate vulgar conduct. Title VII does not offer boorish employers a free pass to discriminate against their employees specifically on account of gender just because they have tolerated pervasive but indiscriminate profanity as well. <u>See</u> <u>Williams v. Gen. Motors Corp.</u>, 187 F.3d 553, 564 (6th Cir. 1999) ("We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment.").

Equally important to our inquiry here is the common-sense rule that the context of offending words or conduct is essential to the Title VII analysis. Even gender-specific terms cannot give rise to a cognizable Title VII claim if used in a context that plainly has no reference to gender. Thus, for example, were a

---

[3] Likewise, the Courts of Appeals have uniformly observed that Title VII is not a civility code, and that harassment must discriminate on the basis of a protected characteristic in order to be actionable. <u>See, e.g.</u>, <u>Lee-Crespo v. Schering-Plough Del Caribe Inc.</u>, 354 F.3d 34, 37 (1st Cir. 2003); <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 223 (2d Cir. 2004); <u>Abramson v. William Paterson College of N.J.</u>, 260 F.3d 265, 280 (3d Cir. 2001); <u>Ziskie v. Mineta</u>, 547 F.3d 220, 228 (4th Cir. 2008); <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258, 263-64 (5th Cir. 1999); <u>Clark v. United Parcel Serv., Inc.</u>, 400 F.3d 341, 352 (6th Cir. 2005); <u>Stephens v. Erickson</u>, 569 F.3d 779, 790 (7th Cir. 2009); <u>Anderson v. Family Dollar Stores of Ark., Inc.</u>, 579 F.3d 858, 862-63 (8th Cir. 2009); <u>Manatt v. Bank of Am., NA</u>, 339 F.3d 792, 798 (9th Cir. 2003); <u>Etsitty v. Utah Transit Auth.</u>, 502 F.3d 1215, 1220-21 (10th Cir. 2007); <u>Davis v. Coastal Int'l. Sec., Inc.</u>, 275 F.3d 1119, 1123-24 (D.C. Cir. 2002).

frustrated sales representative to shout "Son-of-a-bitch! They lost that truck," the term would bear no reference to gender. In contrast, however, when a co-worker calls a female employee a "bitch," the word is gender-derogatory. As we observed in Baldwin, the terms "bitch" and "slut" are "more degrading to women than to men." 480 F.3d at 1302. The original definition of the term "bitch" is "the female of the dog." Webster's Third New International Dictionary 222 (2002). The term's secondary meanings are likewise gender-specific: "a lewd or immoral woman" or "a malicious, spiteful, and domineering woman." Id. Calling a female colleague a "bitch" is firmly rooted in gender. It is humiliating and degrading based on sex. Cf. Harris, 510 U.S. at 23 (holding that, to prove a hostile work environment, courts may consider whether conduct is humiliating).[4]

As the Supreme Court has observed, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale, 523 U.S. at 81-82.

---

[4]Similarly, the context may illuminate whether the use of an extremely vulgar, gender-neutral term such as "fucking" would contribute to a hostile work environment. "Fucking" can be used as an intensifying adjective before gender-specific epithets such as "bitch." In that context, "fucking" is used to strengthen the attack on women, and is therefore relevant to the Title VII analysis. However, the obscene word does not itself afford a gender-specific meaning. Thus, when used in context without reference to gender, "fuck" and "fucking" fall more aptly under the rubric of general vulgarity that Title VII does not regulate. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (observing that harassment with sexual connotations is not by itself sexual harassment).

19

See also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006) ("Context matters."); EEOC v. WC&M Enters., Inc., 496 F.3d 393, 398-99 (5th Cir. 2007) (emphasizing the importance of context for analyzing claims under Title VII). Thus, we proceed with "[c]ommon sense, and an appropriate sensitivity to social context," to distinguish between general office vulgarity and the "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Oncale, 523 U.S. at 82.

A final principle that guides us in this decision is that words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331-32 (4th Cir. 2003) (en banc) (concluding that Title VII may be violated even when the plaintiff is not individually targeted). See also Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004). It is enough to hear co-workers on a daily basis refer to female colleagues as "bitches," "whores" and "cunts," to understand that they view women negatively, and in a humiliating or degrading way. The harasser need not close the circle with reference to the plaintiff specifically: "and you are a 'bitch,' too." See Yuknis v. First Student, Inc., 481 F.3d 552, 553-54 (7th Cir. 2007) (observing that comments need not be directed specifically at a person to be

discriminatory; comments addressed to the plaintiff's "target area" -- that is, her protected group -- may constitute actionable harassment). Similarly, words or conduct with sexual content that disparately expose members of one sex to disadvantageous terms or conditions of employment also may support a claim under Title VII. See Petrosino, 385 F.3d at 222 ("[T]he depiction of women in the offensive jokes and graphics was uniformly sexually demeaning and communicated the message that women as a group were available for sexual exploitation by men.").

Evidence that co-workers aimed their insults at a protected group may give rise to the inference of an intent to discriminate on the basis of sex, even when those insults are not directed at the individual employee. A jury could infer the requisite intent to discriminate when that employee complained to her employer about the humiliating and degrading nature of the commentary about women as a group and the conduct persisted unabated. See Faragher, 524 U.S. at 789 (an employer's knowledge and refusal to act may be read as "the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.").

### III.

If the environment portrayed by Reeves at C.H. Robinson had just involved

a generally vulgar workplace whose indiscriminate insults and sexually-laden conversation did not focus on the gender of the victim, we would face a very different case. However, a substantial portion of the words and conduct alleged in this case may reasonably be read as gender-specific, derogatory, and humiliating. This evidence, measured against the aforementioned principles, is sufficient to afford the inference that the offending conduct was based on the sex of the employee.

A jury reasonably could find on this record that a meaningful portion of the allegedly offensive conduct in the office contributed to conditions that were humiliating and degrading to women on account of their gender, and therefore may have created a discriminatorily abusive working environment. The terms "whore," "bitch," and "cunt," the vulgar discussions of women's breasts, nipples, and buttocks, and the pornographic image of a woman in the office were each targeted at Reeves's gender. Like "bitch," "whore" is traditionally used to refer only to women. The dictionary defines "whore" in terms of gender as "a woman who practices unlawful sexual commerce." Webster's Third New International Dictionary 2612. "Cunt," referring to a woman's vagina, is the essence of a gender-specific slur. See also Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007) ("A raft of case law . . . establishes that the use of sexually

22

degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'bitch,' . . . has been consistently held to constitute harassment based upon sex."); Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000-01 (10th Cir. 1996) (holding that the "intensely degrading" "sexual epithets" "'whore,' 'floor whore,' 'curb whore,' 'curb side cunt,' and 'bitch'" demonstrated a violation of Title VII); Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 964-65 (8th Cir. 1993) (describing terms such as "bitch," "slut" and "cunt" as "[v]ulgar and offensive epithets" that amount to harassment based on sex); Andrews v. City of Phila., 895 F.2d 1469, 1485 (3d Cir. 1990) ("[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment."). A reasonable juror could find that this gender-derogatory language and conduct exposed Reeves to "disadvantageous terms or conditions of employment." Oncale, 523 U.S. at 80 (quoting Harris, 510 U.S. at 25 (Ginsburg, J., concurring)).[5]

---

[5] We do not accord too much weight to the morning radio show. Like so much of the workplace conduct, the morning radio show, which Reeves compared to a Howard Stern show, also aired general, indiscriminate vulgarity and profanity. Nevertheless, Reeves's account of the contents of the show may be relevant in some ways: Reeves also claims to have repeatedly heard gender-specific, derogatory comments about women's anatomy; the commentary may have been subjectively or objectively offensive; and the branch manager's and co-workers' refusal to respond to her repeated complaints may yield an inference about their intent to discriminate. We add that, while the F.M. broadcast station that featured the morning show is subject to F.C.C. controls for obscene language, see 47 C.F.R. § 73.4165 (regulation of broadcasting obscenity on the radio); FCC v. Pacifica Found., 438 U.S. 726, 737-38 (1978) (F.C.C. has the power to regulate profanity over the radio), the show's commentary need not have been obscene to be

The social context at C.H. Robinson detailed by Reeves allows for the inference to be drawn that the abuse did not amount to simple teasing, offhand comments, or isolated incidents, see Faragher, 524 U.S. at 788, but rather constituted repeated and intentional discrimination directed at women as a group, if not at Reeves specifically. It is not fatal to her claim that Reeves's co-workers never directly called her a "bitch," a "fucking whore," or a "cunt." Reeves claims that the offensive conduct occurred "every single day," and that the manager "accepted and tolerated that same behavior" over her repeated complaints. If C.H. Robinson tolerated this environment, it may be found to have adopted "the offending conduct and its results," just as if the employer affirmatively authorized it. See id. at 789.

C.H. Robinson objects, however, that there is no proof of gender animus because Reeves's co-workers began to use gender-specific epithets before Ingrid Reeves arrived at the workplace. Thus, C.H. Robinson argues that Reeves's presence was irrelevant to the insults and, therefore, the conduct did not occur on account of her sex.

This argument is inconsistent with the central premise of Title VII: workers are to be protected from discrimination on account of gender in the workplace.

considered as part of the Title VII calculus.

24

Congress made a clear choice in enacting Title VII of the Civil Rights Act of 1964 "'to strike at the entire spectrum of disparate treatment of men and women' in employment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (quoting Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale, 523 U.S. at 80 (quoting Harris, 510 U.S. at 25 (Ginsburg, J., concurring)). Here, Reeves claims that her conditions of employment were humiliating and degrading in a way that the conditions of her male co-workers' employment were not. It is no answer to say that the workplace may have been vulgar and sexually degrading before Reeves arrived. Once Ingrid Reeves entered her workplace, the discriminatory conduct became actionable under the law. Congress has determined that Reeves had a right not to suffer conditions in the workplace that were disparately humiliating, abusive, or degrading.

At the end of the day, this is a question of intent, which, because intent may be difficult to discern, often requires recourse to circumstantial evidence. See Crawford v. Carroll, 529 F.3d 961, 975-76 (11th Cir. 2008) (noting that a plaintiff may prove discriminatory intent under Title VII by direct or circumstantial evidence); Denney v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001)

25

("Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence.") (quoting Joe's Stone Crab, Inc., 220 F.3d at 1286). We are satisfied on this record that a jury could infer the necessary intent. Simply stated, this is a question for the jury.

Finally, C.H. Robinson suggests that Reeves's co-workers used the terms "bitch" and "whore" to refer to both men and women and that, therefore, these terms cannot themselves be gender-specific. First, as for the term "bitch," there may be a dispute of material fact about this matter. While Mitchell specifically testified that he referred to men in the office by the term "bitch," Reeves claimed never to have heard any male employee refer to another male as a "bitch." Compare Mitchell Dep. 83 with Reeves Decl. ¶ 4. But even accepting that Reeves's co-workers sometimes used the terms "bitch" and "whore" to refer to men, this usage may not make the epithets any the less offensive to women on account of gender. It is undeniable that the terms "bitch" and "whore" have gender-specific meanings. Calling a man a "bitch" belittles him precisely because it belittles women. It implies that the male object of ridicule is a lesser man and feminine, and may not belong in the workplace. Indeed, it insults the man by comparing him to a woman, and, thereby, could be taken as humiliating to women as a group as well.

In short, if Reeves's account is to be believed, C.H. Robinson's workplace was more than a rough environment -- indiscriminately vulgar, profane, and sexual. Instead, a jury reasonably could find that it was a workplace that exposed Reeves to disadvantageous terms or conditions of employment to which members of the other sex were not exposed. Title VII was plainly designed to protect members of a protected group from adverse conditions of employment like those Reeves alleges were endemic to C.H. Robinson.

Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**