[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15914
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cv-00208-TCB

ERAINNIA B. BYRD,

Plaintiff-Appellant,

versus

POSTMASTER GENERAL, U.S.
POSTAL SERVICE,

Defendant-Appellee,

TAMMIE J. PHILBRICK, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(September 3, 2014)

Before HULL, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Erainnia Byrd, proceeding pro se, appeals the district court's dismissal of her state law tort claims and grant of summary judgment in favor of the Postmaster General of the U.S. Postal Service ("the Postmaster") on Byrd's disability discrimination claim and hostile work environment claims based on religious and sexual harassment. After careful review of the record and the parties' briefs, we affirm.

## I.  BACKGROUND

### A.    Byrd's Employment at Old National Station, May 2004 to March 2005

From May 2004 until March 16, 2005, Plaintiff Byrd worked at the U.S. Postal Service's ("USPS") Old National Station ("Old National") as a Sales Service and Distribution Clerk. As set forth more fully later, during this ten-month period, Plaintiff Byrd claims that a female co-worker religiously harassed Byrd by speaking with her about various religious matters, including the Bible, God, and church. Byrd also claims that some of her male co-workers harassed her based on

2

her sex by referring to her using terms such as "baby" and "sugar."   After Byrd

posted a note asking that she be referred to by her name, Byrd became the butt of

her co-workers' teasing.

## B.    Byrd's Disability Leave

On March 16, 2005, Byrd went on leave with pay due to, among other

things, high blood pressure and anxiety.  In August 2005, the Department of

Labor's Office of Worker's Compensation Programs ("OWCP") approved Byrd's

claim for disability benefits based on her diagnosis of major depressive disorder.

On January 24, 2007, the OWCP suspended Byrd's benefits for her failure to

report to three medical examination appointments, as directed by the OWCP.

On March 7, 2007, Robin Watson, Byrd's supervisor at Old National, sent a

letter to Byrd directing her to return to duty on her next scheduled workday or to

provide Watson with acceptable documentation in compliance with the USPS

policy for her absence.[1]  Watson sent the letter because Byrd had been absent from

work since January 2007, when OWCP suspended her benefits, and Byrd had not

informed USPS of the reason for her continued failure to appear for work.

Watson's letter informed Byrd that her failure to comply would result in her

absence being charged to absence without official leave and removal from USPS.

---

[1]On March 23, 2007, Dr. Monique Gray, Byrd's psychologist, sent a letter to Watson stating that Byrd continued to be under Dr. Gray's care for an unspecified condition, that Byrd had been unable to return to work since March 17, 2005, and that Byrd had "never been released to return to duty."  The letter provided no additional details.  Byrd does not argue that this letter constituted acceptable documentation under the USPS policy.

## C.    Byrd's Termination

On March 26, 2007, Watson sent another letter to Byrd, instructing her to report to Old National on April 10 for an investigative interview about her inability to work, but Byrd failed to appear for the interview.  Accordingly, on May 10, 2007, Watson issued a notice, informing Byrd that she would be separated from USPS effective June 15, 2007, based on (1) her continuous absence from work and (2) her failure to provide information as to why she was not at work or cooperate with Watson's attempts to obtain that information.  Despite the May 2007 notice of separation, USPS did not formally terminate Byrd's employment until July 17, 2009.

## D.    Byrd's Lawsuit

On January 21, 2011, Byrd brought this lawsuit against the Postmaster in the district court.  Byrd raised state law tort claims and hostile work environment claims based on religious and sexual harassment under 42 U.S.C. § 2000e-16.[2]

Upon the Postmaster's motion, the district court dismissed Byrd's state law tort claims because they sought redress for discrimination in her federal employment, and the exclusive remedy for such discrimination was Title VII.

---

[2]Byrd's complaint also asserted several other claims, including a retaliation claim against the Postmaster and state and federal claims against Tammie J. Philbrick and Christopher Benosky.  Byrd has abandoned any challenge to the district court's disposition of these claims by not raising them in her initial brief on appeal.  See Timson v. Sampson, 518 F.3d 870, 874 (11th Cir. 2008) (providing that issues that a pro se appellant failed to raise in his initial brief are abandoned).

4

In July 2012, the district court consolidated Byrd's case with another lawsuit she filed, raising a disability discrimination claim under the Rehabilitation Act, 29 U.S.C. § 794, based on the termination of her employment.

The Postmaster moved for summary judgment as to Byrd's remaining claims of disability discrimination and hostile work environment. After extensive discovery, the district court granted the Postmaster's motion for summary judgment.

Byrd timely appealed.

## II. DISCUSSION

At the outset, several of Byrd's claims wholly lack merit and warrant little discussion. First, the district court did not err in dismissing Byrd's tort claims, whether arising under state law or the Federal Tort Claims Act, because Title VII provides the exclusive remedy for Byrd's discrimination claims arising out of federal employment. See Mays v. U.S. Postal Serv., 122 F.3d 43, 45 n.2 (11th Cir. 1997) (citing Brown v. Gen. Servs. Admin., 425 U.S. 820, 835, 96 S. Ct. 1961, 1969 (1976)). Second, the district court also did not err in dismissing Byrd's claim under "5 U.S.C. § 81" because, as noted by the district court, no such statute exists.

Third, the district court did not err in granting summary judgment on Byrd's Rehabilitation Act claim because, even assuming Byrd made out a prima facie case of disability discrimination, she did not rebut the Postmaster's proffered reasons

5

for issuing the May 2007 separation notice—that Byrd (1) had not been at work since the OWCP suspended her benefits on January 24, 2007 and (2) had failed to provide information as to why she was not at work or cooperate with Supervisor Watson's attempts to obtain that information. See Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (discussing the plaintiff's ultimate burden of showing that the employer's proffered reasons for the adverse employment decision was a pretext for disability discrimination under the American with Disabilities Act ("ADA")); see also Sutton v. Lader, 185 F.3d 1203, 1207 n.5 (11th Cir.1999) (stating that "the standard for determining liability under the Rehabilitation Act is the same as that under the ADA"). Indeed, Byrd concedes that USPS did not issue the notice because of any disability, but rather discharged her based on her failure to provide a medical justification for her absence and as a disciplinary action for failing to comply with Supervisor Watson's directives.

Fourth, Byrd raises numerous arguments regarding the district court's management of Byrd's case during discovery and prior to summary judgment, but has not shown reversible error with respect to any of these issues. The record also does not support Byrd's contention that the district court was biased against her as a pro se litigant.

Byrd's hostile work environment claims, however, warrant a fuller discussion.[3] We first review the principles governing hostile work environment claims and then address Byrd's arguments claims of religious and sexual harassment.

## A.    Hostile Work Environment Legal Principles

A Title VII hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Gowski v. Peake, 682 F.3d 1299, 1311 (11th Cir. 2012) (quotation marks omitted). The plaintiff must show that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as religion or sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment. See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (en banc); see also 42 U.S.C. § 2000e-16(a).

---

[3]We review a district court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party. Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1254 (11th Cir. 2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." Id. at 809. Therefore, only conduct that is "based on" a protected category, such as religion or gender, may be considered in a hostile work environment analysis. Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583-84 (11th Cir. 2000), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006). As we have stated, "[i]nnocuous statements or conduct, or boorish ones" unrelated to a protected ground are not counted. Id. at 583. Title VII does not enact a "general civility code" and does not make actionable ordinary workplace tribulations. Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1234 (11th Cir. 2006) (quotation marks omitted).

The fourth element of the hostile work environment test—whether the harassment was sufficiently severe or pervasive—contains both a subjective and objective component. Reeves, 594 F.3d at 809. The employee must "subjectively perceive" the harassment as severe or pervasive enough to change the terms or conditions of employment, and this perception must be objectively reasonable. Id. at 808-09 (quotation marks omitted). In evaluating the objective component, we consider the allegedly discriminatory conduct's "frequency; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quotation

8

marks and ellipses omitted).  The harassment's objective severity or pervasiveness "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  Id. at 809 (quotation marks omitted).

## B.    Religious Harassment Claim

Byrd's religiously-based hostile work environment claim is based on the conduct of one of Byrd's former co-workers, Kay Dexter, who is a fervent Christian.[4]  While at work, Dexter sung religious songs, quoted religious scripture, and preached.  Dexter often spoke to her co-workers about the Bible.  As Byrd acknowledges, Old National allowed Dexter to engage in this behavior before Byrd began working at Old National, and Dexter's "standard topic of conversation" with anyone at Old National was religion.

Dexter also conversed with Byrd about religion, asking how often Byrd went to church and whether she read the Bible.  Byrd told Dexter that Byrd was "nondenominational" and that her "religious beliefs allow [her] to let everyone practice what they choose to practice."[5]  Over a six-month period, from October 2004 until Byrd went on leave, Dexter referred to Byrd as the devil and Satan an

---

[4]Kay Dexter is Byrd's co-worker, not her supervisor.

[5]"The term 'religion' includes all aspects of religious observance and practice, as well as belief . . . ."  42 U.S.C. § 2000e(j).  Like the district court, we assume, arguendo, that Byrd has shown that her beliefs qualify as a religion under Title VII.

unspecified number of times.  On one occasion, Dexter told Byrd she would go to Hell because he did not believe in Jesus.

We assume, arguendo, that Dexter's complained-of conduct was based on the protected category of religion.  Nevertheless, we conclude that Dexter's conduct—consisting of Dexter's (1) singing of religious songs, quoting religious scripture, preaching, and speaking about Church and the Bible; (2) referring to Byrd as the devil and Satan an unspecified number of times over a six-month period; and (3) informing Byrd that she would go to Hell for not believing in Jesus on one occasion—did not create a hostile work environment.  Even considering these incidents cumulatively, a jury could not reasonably find that this conduct was sufficiently severe and pervasive to be objectively hostile and abusive, and thus, this conduct does not satisfy the fourth element of a hostile work environment claim.  Accordingly, the district court did not err in granting summary judgment on Byrd's religiously-based hostile work environment claim.[6]

## C.    Sexual Harassment Claim

Byrd claims that she was subject to a hostile work environment based on her co-workers' use of terms of endearment and then teasing her after she asked them to stop using such terms.  Over a six-month period, different male co-workers

---

[6]Dexter also pinched Byrd on the cheek and called her a "sweetheart" on one occasion. Byrd has not shown that this incident was based on Byrd's religion or sex.

10

referred to Byrd using terms such as "baby, sugar, darling, honey," "shorty or shawty," "my dawg," and "my nigger" when they asked her out on dates on unspecified occasions.  In both her affidavit and deposition, she referred to these names as "terms of endearment."  During this same period, two different male co-workers also touched her arm, held her hand, and rubbed her fingers an unspecified number of times when they came to pick up mail from her.

As a result, Byrd wrote and posted a note in her work area stating that she did not wish to be addressed by those terms or touched.  Instead, Byrd wished to be referred to as "Ms. Michelle Byrd."[7]  After she posted the note, her male and female co-workers began to "make jokes in [Byrd's] presence" about the note and "hug and kiss and rub and grind and do all of those things" to mock Byrd.  Byrd's co-workers would use terms like "Baby" in her presence, and once, she heard a male employee refer to another male employee as "red dog sugar."

After Byrd complained, in October 2004, an Old National supervisor held a meeting on, and played a film about, sexual harassment.  Afterward, the touching of Byrd "basically ended" and Byrd's male co-workers stopped asking her out on dates.  However, Byrd's co-workers continued to "teas[e]" Byrd for writing the

---

[7]Due to the uniqueness of Plaintiff Byrd's first name, she has "self-adopted" the name "Michelle."

11

"terms of endearment" note by "making jokes about being addressed a certain way or hugging" in front of Byrd.

Byrd also complained that her co-workers generally engaged in hostile conduct towards her, as demonstrated by the following incidents: (1) a female employee screaming and slinging mail at Byrd and not allowing Byrd to use the employee's pen; (2) another female employee withholding mail from Byrd and screaming at Byrd about the handling of mail; (3) a male employee attempting to humiliate Byrd with his "smart remarks" concerning her work; (4) a male employee, named Dexter Brown, writing "bid out Brown please" on Byrd's "terms of endearment" note; and (5) unnamed employees asking Byrd to process the mail in a way that violated postal procedure and that could have resulted in Byrd being disciplined or terminated.  Byrd also complained of (1) employees repeating a movie line about calling the "po-po" and not being afraid of the "po-po," which the movie character said while carrying a gun, and (2) a fellow employee stating that it was "time for a killing" since it was "getting close to Memorial Day."

Most of the complained-of harassment was not based on Byrd's sex and, thus, does not satisfy the third element of a hostile work environment claim.  As Byrd admits, her male and female co-workers used "terms of endearment" to refer to each other and hugged and touched one another in front of Byrd because she was the "the running joke" and was "being mocked."  See Faragher v. City of Boca

Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998) (stating that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" will not amount to a hostile work environment (citation omitted)).  Much of the harsh treatment Byrd received in the course of processing mail was due to her co-workers' personal animosity towards her, not because of her sex.  See also Succar v. Dade Cnty. School Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) ("Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination. The plaintiff cannot turn a personal feud into a sex discrimination case." (quotation marks and ellipses omitted)).  While much of Byrd's co-workers' behavior was boorish, unprofessional, and unfriendly, it was not harassment based on Byrd's sex.  See Gupta, 212 F.3d at 583.[8]

The pre-October 2004 conduct by several of Byrd's male co-workers, however, even if based on Byrd's sex, was not sufficiently severe or pervasive so as to alter the conditions of Bryd's employment and create an abusive working environment.  This conduct consisted of: (1) male co-workers asking her out on dates and using "terms of endearment" to refer to her; and (2) two male co-workers touching her on the arm and hand.  This conduct occurred for a period of six

---

[8]On appeal, Byrd does not argue that her co-workers' teasing created a retaliatory hostile work environment, and thus, we do not address this issue.

13

months at an unspecified frequency and stopped after Old National showed a video on sexual harassment. The different terms by which male employees called Byrd were not severe, humiliating, or physically threatening, as Byrd herself admitted that they were "terms of endearment." Furthermore, the evidence does not show that this conduct unreasonably interfered with her work performance. Considering all of the circumstances, we conclude that a jury could not reasonably find that the conduct of these male co-workers was sufficiently severe and pervasive to be objectively hostile and abusive.

### III.  CONCLUSION

For all of the foregoing reasons, we affirm the district court's dismissal of Byrd's state law tort claims and grant of summary judgment in favor of the Postmaster on Byrd's disability discrimination and hostile work environment claims.

**AFFIRMED.**