[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14921
Non-Argument Calendar
_____

D.C. Docket No. 2:12-cv-00673-WHA-SRW

STEPHEN MCKITT,

Plaintiff-Appellant,

versus

ALABAMA ALCOHOLIC BEVERAGE CONTROL BOARD,
JEFF ROGERS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(July 10, 2014)

Before HULL, MARTIN and ROSENBAUM, Circuit Judges.

PER CURIAM:

Stephen McKitt appeals the district court's grant of summary judgment to defendant Alabama Alcoholic Beverage Control Board ("ABC Board") on his racially hostile work environment claim, brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1).  After careful review of the record and the parties' briefs, we affirm.

## I.  BACKGROUND

In 1994, plaintiff Stephen McKitt began his employment with the ABC Board as an Enforcement Agent I, and he continued in this position at least through 2012.  Plaintiff McKitt claims that his supervisors created a racially hostile work environment from 2008 to 2012 by treating him differently than similarly situated Caucasian agents.

In the district court, Agent McKitt did not bring a termination claim and admitted in his June 2013 deposition that he still worked for the ABC Board. McKitt did bring failure to promote claims, but on appeal he does not challenge the district court's grant of summary judgment in favor of the ABC Board on his promotion claims.  Instead, his appellate briefs address only his racially hostile work environment claim.

We review the evidence about the ABC Board, Agent McKitt's supervisors, and the incidents that McKitt argues were disparate treatment based on race.

2

## A.    The ABC Board and Agent McKitt's Supervisors

The ABC Board controls the marketing and distribution of alcoholic beverages in Alabama. The ABC Board is run by an Administrator, who is the "final decision maker for all hiring, firing, disciplinary, and promotional decisions for ABC Board employees." From 2003 to January 2011, Emory Folmar was the Administrator of the Board. In January 2011, another administrator, not relevant to this lawsuit, was appointed.

Agent McKitt worked at the ABC Board's Law Enforcement Division, which employs more than 120 sworn officers (including agents, like McKitt), all of whom have full police powers throughout Alabama. A "Chief" heads the Law Enforcement Division, and a "Captain" works under the Chief.[1] As relevant to this lawsuit, Jeffery Rogers, a Caucasian, was the Chief, and John Richardson, an African-American, was a Captain. Both were McKitt's top supervisors.[2]

The Law Enforcement Division has eleven geographical enforcement districts across Alabama. A lieutenant, sometimes with the support of a sergeant, heads each enforcement district office, supervising each district office's enforcement agents.

---

[1]The Law Enforcement Division's command center for state-wide operations is located in Montgomery.

[2]In his complaint against the ABC Board, Agent McKitt also named Chief Jeffery Rogers as a co-defendant. The district court granted summary judgment in favor of defendant Rogers, and Agent McKitt does not appeal this part of the district court's ruling. We therefore do not address claims against Chief Rogers.

3

From 2008 to 2012, the time period relevant to his lawsuit, Agent McKitt worked in either the District Ten office or the ABC Board's warehouse, both located in Montgomery.  Agent McKitt's lieutenant-supervisors in the District Ten office were: (1) from 2008 to October 2009, Lieutenant Dennis Hill, a Caucasian; (2) from October 2009 to December 18, 2009, Lieutenant Jean Turner,[3] a Caucasian; and (3) from late November-early December 2009 to 2012, Lieutenant Kenny Davis, a Caucasian.  When Agent McKitt worked in the warehouse post-October 2009, his supervisor was Lieutenant Hill.

## B.    Agent McKitt's Job Duties

Enforcement agents, like plaintiff McKitt, had several duties, including (1) investigating illegal activities, such as alcohol and tobacco violations; (2) completing forms, such as incident/offense reports and applications for search and arrest warrants; and (3) completing ABC license applications.

Enforcement agents' duties also included security details at the Montgomery warehouse, and most warehouse assignments lasted a half-day or day.  Warehouse security detail required an agent to walk around the warehouse and ensure, inter alia, that warehouse workers were not stealing inventory.  According to Agent McKitt, "Enforcement Agents did not like working in the warehouse because it was dirty as well as cold in the winter and hot in the summer."

---

[3]According to McKitt, Lieutenant Turner was "known as the person who would terminate employees Chief Rogers wanted gone."

We now review the alleged incidents, which Agent McKitt claims were disparate treatment, creating a racially hostile work environment.

## II.  INCIDENTS WITH NO DISPARATE TREATMENT SHOWN

### A.    2008 GPS-Tracking Device Investigation

Agent McKitt claimed that, in June 2008, McKitt's Caucasian neighbor complained to the ABC Board that Agent McKitt was frequently at home during business hours.  With Chief Rogers's approval, a GPS-tracking device was placed on Agent McKitt's vehicle.

In September 2008, after the investigation revealed no unusual movements to substantiate the citizen complaint, the GPS device was removed from Agent McKitt's vehicle.

The ABC Board's records showed, however, that, since 2005, nine ABC Board employees (including Agent McKitt) were subject to GPS monitoring, seven of whom were Caucasian.  Further, one of the seven investigations of Caucasian agents was initiated by a citizen complaint, not a supervisor complaint.  Thus, this incident does not show disparate treatment based on race.

### B.    September 2008 Fitness for Duty Form

After the GPS device was removed from Agent McKitt's vehicle, Chief Rogers requested that McKitt have his physician complete a "fitness for duty" form, indicating whether McKitt could undergo physical training.  Chief Rogers

5

made this September 2008 request because Agent McKitt had been excused from physical training since October 2007 due to colon cancer.

Although he disagreed with the request, Agent McKitt complied with Chief Rogers's request, and Agent McKitt's physician cleared Agent McKitt to perform all job duties, including physical training. Agent McKitt provided no evidence that this request was unique to him or based on disparate treatment.

## C.    December 2008 Warehouse Assignment

In December 2008, Lieutenant Hill assigned Agent McKitt to work in the warehouse for a five-day period. Lieutenant Hill told Agent McKitt that the assignment was because McKitt was "not performing [his] job duties" and his overall ranking as an agent was too low. Agent McKitt stresses that: (1) he was in the middle range of the approximately 70 agents in the state, and (2) Agent Mark Barber, a Caucasian, who was ranked lower than Agent McKitt, did not receive a similar assignment in December 2008.

According to the ABC Board's records, however, at least one other Caucasian agent had worked a five-day warehouse assignment between November 2007 and November 2008. And, at least three other Caucasian agents had also worked five-day warehouse assignments sometime prior to 2013, including Agent Barber. Also, District Ten employees in Montgomery (and other Districts geographically close to Montgomery) are assigned to the warehouse in

6

Montgomery more frequently than employees of other districts. The record thus shows Agent McKitt's five-day assignment was not disparate treatment.

### D.    November 2009 Written Reprimand for Sleeping

On November 6, 2009, during his lunch hour, Agent McKitt fell asleep at the District Ten Office, and a sergeant saw and recorded him sleeping and reported the incident to Lieutenant Turner. Lieutenant Turner believed that Agent McKitt was not on his lunch hour, but was on duty.

On November 23, 2009, Lieutenant Turner reprimanded Agent McKitt in writing for sleeping on the job. Lieutenant Turner believed that she could have terminated his employment for such a serious offense, but chose a less severe form of punishment (the written reprimand) due to Agent McKitt's years of service. Agent McKitt provided no evidence that such discipline for like offenses was unique to him or disparate treatment.

### E.    Seven-Month Warehouse Assignment, December 2009 to June 2010

On December 7, 2009, shortly after the ABC Board's full-time warehouse security officer resigned, leaving a gap in warehouse security, Chief Rogers assigned Agent McKitt to work full-time in the warehouse for seven months from December 7, 2009 until mid-June 2010.

The evidence about this warehouse assignment is: (1) Agent McKitt admits that he informed Lieutenant Hill that he preferred warehouse work "to the

alternative," which was working in the District Ten office under Lieutenant Davis, who Agent McKitt believed wanted to terminate him; (2) Chief Rogers assigned Agent McKitt the extended warehouse detail after Lieutenant Hill told Chief Rogers that Agent McKitt liked working in the warehouse;[4] and (3) Agent McKitt did not complain to Chief Rogers or Lieutenant Davis about this warehouse assignment. Agent McKitt assumed that the seven-month warehouse assignment was because of his November 2009 written reprimand for sleeping, but there is no evidence supporting this assumption. For all of these reasons, Agent McKitt has not shown that this warehouse assignment was disparate treatment either.

**F.    Miscellaneous Incidents, August 2010 to September 2011**

Agent McKitt also did not present evidence of disparate treatment with regard to the following incidents: (1) sometime after June 2010, Lieutenant Davis cursed at Agent McKitt after he discovered that Agent McKitt failed to use surveillance equipment on his informant during an undercover operation undertaken to acquire a warrant to search a shot house;[5] (2) in August 2010, Captain Richardson indicated that Agent McKitt was not working hard enough and that he would "be watching [McKitt]"; (3) in December 2010, the day after Agent

---

[4]Evidence also suggests that Chief Rogers assigned Agent McKitt to the warehouse for seven months because he did not believe that Agent McKitt was making "enough cases."

[5]A shot house is an illegal, unlicensed bar, where alcohol is sold by the shot. Confidential informants are routinely patted down before entering shot houses. Agent McKitt had not placed surveillance equipment on informants before and believed that it was dangerous to require an informant to wear surveillance equipment.

8

McKitt testified at another agent's grievance hearing concerning race discrimination, Lieutenant Davis announced a long list of general policy changes that applied equally to all District Ten agents; (4) on January 4, 2011, Lieutenant Davis reassigned Agent McKitt from Montgomery County to Bullock County (both counties are within District Ten), even though Agent McKitt was "comfortable in Montgomery County"; (5) on July 29, 2011, Agent McKitt cursed in the presence of a sergeant and that sergeant subsequently counseled Agent McKitt for his cursing; and (6) on September 13, 2011, Lieutenant Davis gave Agent McKitt a performance appraisal where Agent McKitt was rated as meeting standards, but Agent McKitt believed that he deserved a higher score.

## III.  INCIDENTS WITH EVIDENCE OF DISPARATE TREATMENT OR RACIAL ANIMUS

Agent McKitt did present evidence of a few incidents where he was treated differently than Caucasian agents.

First, Agent McKitt testified that Caucasian agent Richard Holston harassed him when, according to McKitt, Agent Holston "expressed his concern and disapproval of Agent McKitt's lower level of work than that of Caucasian agents" and stated that he was "sick and tired of people that don't think they have to do nothing just because they file lawsuits."

Second, while working in the warehouse, Lieutenant Davis told Agent McKitt that he was not allowed to use the warehouse's golf cart that the

9

warehouse's security guard used when he was on duty.  Agent McKitt testified, however, that he saw Caucasian agents doing so.

Third, beginning in June 2010 and continuing throughout 2011, Lieutenant Davis often reprimanded McKitt for errors in paperwork, including redlining and marking up his license applications.  Agent McKitt admitted that he "mess[ed] up [license] applications big time" because the process had changed from a paper process to a computer process while Agent McKitt was on his seven-month warehouse assignment.  In McKitt's affidavit, however, he testified that his co-worker, Agent Valencia Aaron, told Agent McKitt that two Caucasian agents (Agents Jeremy Peterson and Craig Shook) had far more errors in their license applications, but Lieutenant Davis did not redline their applications, like he did with Agent McKitt's applications.  Agent McKitt acknowledged, in his deposition, that he did not have personal knowledge of how closely Lieutenant Davis scrutinized the Caucasian agents.  As the ABC Board has not objected to the admissibility of this evidence, we count it on the disparate treatment side for purposes of the summary judgment motion.

Fourth, Agent McKitt's best evidence is these racial slurs.  Chief Rogers used racial language in McKitt's presence once, on September 21, 2011.  During a meeting with Agent McKitt, Chief Rogers was "trying to reassure [McKitt] . . . could or would be promoted eventually [from the position of enforcement agent to

10

sergeant]." According to Agent McKitt, Chief Rogers quoted the movie Full Metal Jacket, stating "There is no racial bigotry here. I do not look down on niggers, kikes, wops or greasers. Here you are all equally worthless."

Agent McKitt learned from Agent Aaron, an African-American, that Chief Rogers had called Agent Aaron "a nigger that wanted something for nothing," in reference to her racial discrimination lawsuit.

Agent McKitt also testified that he had heard that Administrator Folmar used racially derogatory language, like the "N word," but during his deposition, he could not cite any specific examples, could not state who had told him that Administrator Folmar used racially derogatory language, and referred to what he had heard as "rumored speculation." Agent McKitt's appellate brief does not point us to any evidence of additional racially derogatory language or acts by Administrator Folmar that Agent McKitt had personal knowledge of prior to this lawsuit. Administrator Folmar did, however, call Agent McKitt names unrelated to race, like "fatty."

During the 2008 to 2012 time period in question, Agent McKitt was personally unaware of other instances of overtly racial statements or acts at the ABC Board. Importantly, Agent McKitt was unaware of any instances of Captain Richardson or Lieutenants Hill, Turner, or Davis using racial slurs or committing overtly racial acts.

11

## IV.  DISTRICT COURT PROCEEDINGS

On August 6, 2012, Agent McKitt brought this lawsuit in the district court.

After extensive discovery, the district court granted the ABC Board's motion for

summary judgment.  In ruling on Agent McKitt's hostile work environment claim,

the district court determined that McKitt failed to show a racial animus for much of

the claimed harassment based on disparate treatment.  The district court also

determined that the claimed harassment was not objectively severe or pervasive,

such that the terms or conditions of Agent McKitt's employment were altered.

Agent McKitt timely appealed.[6]  In this appeal, Agent McKitt focuses only

on his racially hostile work environment claim against the ABC Board.[7]

## V.  DISCUSSION

### A.    General Legal Principles

A race-based hostile work environment claim under Title VII is established

upon proof that "the workplace is permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

---

[6]We review a district court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party.  Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

[7]Because Agent McKitt has abandoned all other claims against the ABC Board, we address only Agent McKitt's hostile work environment claim.  See Rioux v. City of Atlanta, 520 F.3d 1269, 1274 n.4 (11th Cir. 2008).

the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (citation omitted) (quotation marks omitted). Hostile work environment claims "are based on the cumulative effect of individual acts." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 2073 (2002).

A plaintiff wishing to establish a hostile work environment claim must show that: (1) he belongs to a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment under either a theory of vicarious or direct liability. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012); see Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

The fourth element of the hostile work environment test—whether the harassment was sufficiently severe or pervasive—contains both a subjective and objective component. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 809 (11th Cir. 2010) (en banc). The employee must "subjectively perceive" the harassment as severe or pervasive enough to change the terms or conditions of employment and this perception must be objectively reasonable. Id.

13

In evaluating the objective component, we consider the allegedly discriminatory conduct's "frequency; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 808-09 (quotation marks and alteration omitted). The objective severity or pervasiveness of harassment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 809. "A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her," Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1522 (11th Cir. 1995), but she must have knowledge of the remarks, Adams v. Austal, U.S.A., L.L.C., No. 12-11507, slip op. at 13 (11th Cir. June 17, 2014).

## B.    Agent McKitt's Appeal

With respect to most of the incidents comprising his hostile work environment claim, Agent McKitt has not presented evidence creating a genuine dispute as to whether the incidents involved disparate treatment or racial animus. See Jones, 683 F.3d at 1297 (stating that "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis").

However, as to the following incidents, Agent McKitt has presented some evidence of racial animus or disparate treatment based on his race: (1) the

14

warehouse golf-cart restriction; (2) Lieutenant Davis's June 2010-2011 scrutiny of McKitt's paperwork; and (3) most notably, the one race-based slur by Chief Rogers in Agent McKitt's presence and Agent McKitt's testimony that he had heard that Chief Rogers and Administrator Folmar made racially derogatory remarks.[8]

We recognize that, in the district court, Agent McKitt filed affidavits and depositions of other ABC Board Employees wherein those employees gave instances of Chief Rogers and Administrator Folmar using racially derogatory language.  However, Agent McKitt has not argued, much less shown, that he was aware of these specific instances until after this lawsuit was filed.  Instead, in his appellate brief, he admits that he (1) was aware of "only a few" "racist remarks or indicia" and (2) "is vague as to when and under what circumstances he was told about the others."  Thus, we do not consider this evidence as part of McKitt's hostile work environment claim.  See Adams, No. 12-11507, slip op. at 13 (determining that "a district court should not consider evidence of racial harassment of other employees—evidence that the plaintiff did not know about—in evaluating the objective component of a claim of a hostile work environment"); see also Edwards, 49 F.3d at 1522 (noting that certain incidents were not made

---

[8]Contrary to Agent McKitt's argument, every incident in 2008 and 2012 does not become race-based merely due to this evidence.  However, we certainly count this evidence in evaluating his hostile work environment claim.

known to the plaintiff until after her termination, and declining to consider those incidents as evidence in support of her hostile work environment claim).

Even assuming, arguendo, that Agent McKitt's evidence is sufficient to show that certain incidents were based on Agent McKitt's race, we cannot say that McKitt has shown that the complained-of conduct was objectively "severe or pervasive," as required to create, under our precedent, an actionable hostile work environment claim. Under the totality of the circumstances, including that there was no evidence that the alleged harassment was physically threatening or frequent and that Agent McKitt heard only one overtly racially derogatory remark over the course of 19 years of employment, McKitt has not shown a genuine issue of material fact as to whether the alleged harassment was objectively severe or pervasive enough to establish a prima facie case of a racially hostile work environment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998) (providing that "isolated incidents (unless extremely serious)" are insufficient to establish a hostile work environment under Title VII (citation and quotation marks omitted)); McCann v. Tillman, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (affirming summary judgment on appellant's hostile work environment claim where alleged conduct included two demeaning comments made in

16

appellant's presence, and two additional racial epithets spoken outside her presence in a period of less than three years).[9]

For all of these reasons, we conclude that the district court committed no reversible error in granting the defendants' motion for summary judgment on Agent McKitt's Title VII racially hostile work environment claims.

## C.    Failure to Promote

Lastly, although Agent McKitt does not appeal the grant of summary judgment in favor of the ABC Board on his failure to promote claims, McKitt lists the ABC Board's failure to promote him as contributing to his hostile work environment.  Agent McKitt, however, has not: (1) cited the parts of the record on which he relies; (2) stated who the decisionmakers were for each time he was not promoted; or (3) indicated how the decisionmakers based their decision not to promote Agent McKitt on his race.  Additionally, McKitt acknowledges the ABC Board's argument that white agents were promoted over Agent McKitt because of their superior qualifications, but does not attempt to rebut that argument.[10]

---

[9]We acknowledge that Agent McKitt argues that, to establish his claim, he has to show only that race was a motivating factor in his supervisors' actions.  We have not yet decided whether a mixed-motive analysis applies in a hostile work environment case.  We need not decide this question because we conclude that, with respect to the majority of the claimed harassment, Agent McKitt has not shown that race was a motivating factor, and the remainder of the claimed harassment was not sufficiently severe or pervasive to create a hostile work environment.

[10]Further, we do not address any pattern-or-practice claim that Agent McKitt is attempting to raise, as this claim may be brought only by a private individual as a class action

17

## VI.  CONCLUSION

For all of the foregoing reasons, we conclude that the district court did not

err in granting summary judgment in favor of the ABC Board on Agent McKitt's

racially hostile work environment claim.

**AFFIRMED.**

---

under Rule 23 of the Federal Rules of Civil Procedure.  See Davis v. Coca-Cola Bottling Co.
Consol., 516 F.3d 955, 965, 968 n.29 (11th Cir. 2008).