[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13368
Non-Argument Calendar
_____

D.C. Docket No. 6:11-cv-01110-RBD-KRS

MELISSA SMITH,

Plaintiff-Appellee
Cross Appellant,

versus

CITY OF NEW SMYRNA BEACH,
a municipal corporation,

Defendant-Appellant
Cross Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(October 23, 2014)

Before TJOFLAT, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Firefighter/paramedic Melissa Smith brought this employment-discrimination action against her employer, the City of New Smyrna Beach ("City"), under Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.10(1), (7), alleging that she suffered years of sex-based workplace hostility before she was finally terminated based on her sex and on her complaints of sex-based discrimination. Following a six-day trial, a jury entered a verdict in Smith's favor on all her claims, and awarded her $244,000 in lost compensation and $200,000 for emotional pain and mental anguish. The district court ordered Smith reinstated as a firefighter.

On appeal, the City argues that the district court erred in denying its renewed motion for judgment as a matter of law and alternative motion for new trial as to Smith's claims. The City contends that the circumstantial evidence presented at trial failed to show that it intentionally discriminated against Smith, that its reasons for terminating her were pretextual, or that the hostility in the workplace was sufficiently "severe or pervasive." The City also argues that the district court abused its discretion in refusing to admit into evidence an arbitration award in which the City was found to have "just cause" for Smith's termination, that the court erred in instructing the jury on the causation element of Smith's retaliation claim, and that the court should have granted the alternative motion for a new trial.

2

In her cross-appeal, Smith argues that the court erred in instructing the jury on the amount of lost wages and benefits that could be awarded as damages.

We begin by explaining the factual and procedural background for this appeal and then address the merits of the parties' claims on appeal.

BACKGROUND

## I. Factual Background

Smith was hired by the City in 2003 as a firefighter/emergency medical technician ("EMT"). She obtained her paramedic license in 2004. She worked as a firefighter/paramedic from that point until her termination in 2008.

During her initial job interview, Fire Chief Tim Hawver told Smith that he "only really hire[d] men that hunt, fish, or camp," but that he had "heard [she was] a pretty good ballplayer." Chief Hawver also told Smith that she reminded him of his daughter, who was a single mother like Smith.

When Smith showed up for work, she found that male firefighters had covered her Standard Operating Procedures Manual with the front of a Cosmopolitan magazine. At that time, the only other woman working at the fire department, which employed from around 39 to 51 people, was Lieutenant Cindy Richenberg. Smith viewed Richenberg as a mentor. Richenberg's advice to Smith was as follows: "[K]eep your head down and your mouth shut," and, "Be smart

3

about the actions you take, and you'll get through this, but it's going to be difficult." It was difficult for Smith, as the following facts make clear.

In April 2004, Battalion Chief Michael Coats, one of the three battalion chiefs,[1] told Smith that he did not believe women should be in the fire service and that it was her "responsibility to prove it otherwise." Lieutenant Paul Owens nodded his head in agreement. According to the testimony of another male firefighter, Coats "was more than happy to express his disinterest about women being in the fire service," such as comments about women not being able "to pull their own weight or do the job of a man." Owens was more vulgar than Coats, but no less direct, in expressing his hostility to women in the fire service. Owens told Smith, "[W]e [don't] need another split-tail here." The term "split-tail" was explained to be a derogatory reference to the female anatomy.

Throughout her tenure with the fire department, Smith was disciplined in ways which led her to believe that the rules were being applied differently to her because she was a woman. For example, Smith was written up by Lieutenant Scott Kirsch for leaving the station to grab lunch with a male firefighter before a

---

[1] Firefighters worked in three rotating 24-hour shifts. The three battalion chiefs were responsible for staffing the four fire stations, with one chief covering each of the rotating shifts. Each station was staffed with a lieutenant, a driver, and a firefighter, one of which was required to be a designated paramedic. Among other responsibilities, the lieutenant ensured compliance with protocols and procedures. Immediately above the battalion chiefs in the hierarchy was Deputy Chief David McCallister, who was immediately below Chief Hawver. Chief Hawver, in turn, reported to the City Manager, John Hagood.

meeting, but the male firefighter was not also disciplined. In addition, men at the fire department frequently used the station computer for personal activities and were not written up for it, but Smith was written up for using a social-media website in connection with organizing the firefighters union's upcoming charity auction.[2] Another woman who joined the fire department in 2005, Jami Ryle, also reported experiencing disparate disciplinary treatment. On one occasion, Ryle was required to write an apology, to be placed in her personnel file, for having her gear on improperly, when multiple male firefighters responding to the same scene also had their gear on improperly but did not have to apologize.

When Smith spoke to Lieutenant Richenberg about these and other similar incidents, Richenberg told her that there was nothing to be done because no one would stand up for her. Richenberg stated that she had also reported "gender-related" situations to management, but management, rather than helping, blamed her instead.

After some initial difficult incidents with Coats, Smith complained to Deputy Chief McCallister. While he did not blame Smith as Richenberg had warned, McCallister simply told her that she could file a claim for a hostile work environment if she felt strongly about it but that doing so would make her life much more difficult going forward.

---

[2] Smith was elected Secretary of the union in 2006.

Smith married in 2006. Thereafter, Chief Hawver and Deputy Chief McCallister asked her multiple times when she was going to get pregnant. McCallister in particular told Smith that he could not wait for her to get pregnant so that she could work as a secretary rather than as a firefighter. McCallister also told Smith's husband that he could stop by the station "for a few minutes" anytime he wanted, which Smith's husband took as an offensive insinuation that he should get Smith pregnant. Smith did in fact become pregnant in July 2006, and she informed people at the fire department soon after.[3] Smith was told that Hawver was "not happy" about her pregnancy.

After she became pregnant, Smith was refused any chance to work overtime, which limited her compensation. She was also passed over in favor of male firefighters for "out of class" work—filling in for higher paid driver-engineer positions—even though she was at the top of the promotion list for this type of work. Ryle also reported that Lieutenant Owens would not allow her to perform certain jobs that male firefighters were allowed to perform. At some point, two male firefighters, one of whom had made sexually explicit comments and advances to Smith such as "Oh, I'd like to bend you over," asked not to work with her and their requests were honored.

---

[3] Smith later suffered a miscarriage.

Things began to escalate during 2007, according to Smith.  In April 2007, Smith asked Lieutenant Tyrone Ofide, the supply officer, for new brush-fire pants because her pants exposed about one inch of her skin.  Ofide denied her request, responding that Smith was "fat" and "just need[ed] to lose some weight." According to Smith, Ofide had never denied proper gear to male firefighters. Later, in August 2007, Smith was opening a can of tuna for lunch at work when she dropped it and said, "Oh, shit."  Ofide heard her and responded, "Ladies shouldn't talk like that.  I don't know why your husband puts up with you.  I can't wait to retire so I can tell you what I really think of you."  Smith reported this to Battalion Chief Wofford, who responded, "Well, that's just Tyrone."

Smith also received several written reprimands throughout 2007 relating to her alleged failure to wash the fire truck.  On one occasion, Smith was written up for improperly washing a truck that was not dirty.  On another, she was written up even when she returned as ordered to clean the truck after her shift ended.  She testified that other male firefighters who had left the fire truck in similar states were not reprimanded.  During her next shift, Smith was again written up for failing to clean the truck, this time after she had been ordered not to.

The end to Smith's tenure with the fire department (at least until her eventual reinstatement) began on August 22, 2007.  On that day, Smith arrived at the fire station before her shift began wearing the majority of her uniform but also

casual shoes. Lieutenant Kirsch, who had written Smith up several times for insubordination, told her that policies would be changing and that she would no longer be able to wear casual shoes to work. Smith responded, "You can kiss my ass. I'm off—not even at work yet." Lieutenant Ofide reported the incident, and Smith was charged with cursing at the fire-department administration, although Smith testified she was merely cursing at Kirsch. The on-duty battalion chief, which was Wofford at the time, generally was responsible for investigating such an incident, but the investigation was transferred to Coats, who sustained the allegations. In his report, Coats noted that, during his investigation, Smith stated that she had been verbally abused and discriminated against with sexist remarks fifteen times. Smith was suspended for 24 hours without pay. Numerous firefighters testified at trial that men in the fire department regularly cursed and had never been suspended.

Later in the day on August 22, Smith and two male firefighters responded to a paramedic call. A truck had rear-ended a mass-transit bus. The male firefighters were Ofide, an EMT, and Gagliardi, a junior firefighter/paramedic. As the lead paramedic responding to the scene, Smith was responsible for making all medical decisions. Because of this, Ofide was subordinate to her with respect to medical issues at the scene of the accident, even though Ofide outranked her.

8

There appeared to be two serious injuries at the scene. Pinned in the front seat of the truck was a 350-pound man, who was conscious and talking and had no complaints other than that he was stuck. In the bus was an elderly blind man who was slumped in his chair and bleeding from his ear, potentially indicating that he had suffered a serious head injury. The bus driver described the elderly man as "really bad" and "hurt." Based on these initial observations, Smith believed the man on the bus to be more severely injured.

After surveying the injuries at the scene, Smith went to retrieve medical equipment and encountered Ofide. According to Smith, when she told Ofide of the man in the bus, he said, "We need to get this guy out in the truck," which Smith took not as an order but as a comment that he and Gagliardi were working to extract the man from the truck while Smith helped the man on the bus. In contrast, Ofide testified that he had ordered Smith to help him with the man in the truck, but she responded that she was going to assist the man on the bus. Despite the patients' initial appearances, the man on the bus was not severely injured, while the man in the truck died en route to the hospital. Smith had not called a "trauma alert," which alerts the necessary parties that a patient is seriously injured and will require care at a trauma facility. Ofide, Smith, and Gagliardi all had the authority to call such an alert, although none did (a paramedic who responded to the scene after Smith and Ofide did).

In the days following the paramedic call, Smith discovered an email from Ofide on the station computer labeled "Sex Tips for Mid-Life Women." The email made Smith uncomfortable, and she submitted a written complaint in addition to asking Ofide to remove the email. In response, Deputy Chief McCallister stated that the email "may have violated city policy" but that it "was published as an educational document." Smith took McCallister's response as a "slap in the face," and she did not believe that Ofide was ever punished.

After discovering the email, Smith learned that Ofide had charged her with insubordination during the August 22 incident for failing to obey his command to help the man in the truck. Coats handled the investigation of the charge and sustained Ofide's allegations, resulting in Smith's 48-hour suspension without pay.

Around this time, Smith attempted to swap shifts with another firefighter but was told by Coats that she needed her lieutenant's approval, which was not general practice. The lieutenant, Owens, did not approve the change "[b]ecause [he was] not working with two women" and was not going to "baby-sit two girls," and he stated that Smith was not qualified for the change. Smith testified that she was qualified for the change, but was not allowed to cover the shift.

Also around this time, Smith had several conversations with Carol Hargy, the City's Human Resources Director. Smith told Hargy about the hostile work environment she experienced, including being called fat, stupid, and a "split-tail."

10

She also said that Owens referred to her as "kid," and, when Smith asked him to address her properly, he responded, "I'll address you however I want to. You just need to shut up." Smith also told Hargy about having her overtime removed and about how the rules were being applied differently to her than they were to male firefighters.

When Smith returned to work after serving her suspension in October 2007, she was reassigned to a different fire station with Lieutenant Grace. Grace told Smith that now that he was stuck with her, he would have to look after her and make sure she followed the rules because she had "a big target on [her] back." He also said that there were new rules, among them, "girl magazines" such as Cosmopolitan, Glamour, and fashion-based magazines would not be permitted at fire stations, although male firefighters were permitted to have pornographic, hunting, and rifle magazines. Grace also told Smith that she was not permitted to bring tampons into the fire station and would have to change tampons in her car. The no-tampon rule was at the direction of Wofford, who had discovered a box of tampons in a grocery bag at the fire station.

Smith testified that the attitude of men at the fire station changed significantly when she returned from serving her suspension. Grace told her that the men were upset at her for complaining about Ofide. When Smith expressed her

11

displeasure about this, Grace told her that "he'd be more than happy to get rid of [her]" by transferring her to another fire station.

On October 24, 2007, Smith filed a grievance through the union about the way in which the investigations leading to her suspensions for cursing and insubordination had been conducted. In response, she was investigated for "for making or publishing false, vicious, malicious or unprofessional statements concerning employee department heads, official board members or the commission."

On or around October 26, Deputy Chief McCallister began a second investigation into the August 22 incident—this time charging Smith with willful neglect leading to a patient's death. It was not general practice for the chief or deputy chief to be the investigating officer. Smith was distraught when she learned about the investigation, and she met with HR Director Hargy again to discuss the investigation and the new rules Grace had described. Smith also sought to meet with Chief Hawver, but he refused. The fire department later initiated another investigation into Smith relating to a driver's test, which Smith claimed was retaliatory. She was further written up based on her failure to provide documentation of her complaints about the exam. Smith testified that she became afraid of putting anything in writing for fear that it would be used to initiate another investigation against her.

12

In December 2007, Smith, along with her union representative, met with Hargy and City Manager John Hagood, during which meeting Smith recounted the history of harassment she had experienced up until that time. Smith also asked for clarification about the no-tampon rule, and Hagood and Hargy told her that they would have to speak to the City's attorney. At a later meeting with Hargy, Smith stated that sexual-harassment training was needed, but Hargy said it was not in the budget. Hargy testified that she advised Chief Hawver of Smith's complaints of discrimination in December 2007.

Around this time, Smith also began to have difficulty with other firefighters following her directions. For example, Smith responded to a call in December 2007 as the lead paramedic, along with Lieutenant Owens and David Dearwester, a male firefighter. Dearwester openly complained about Smith's instructions and refused to listen to her medical directions. Smith spoke privately with Owens about Dearwester, and the transport agency who had also responded to the scene said that they would be reporting Dearwester for his "highly unprofessional" conduct. As far as Smith knew, Dearwester was not suspended for his conduct.

In January 2008, Smith began to have panic attacks, became depressed, and had trouble focusing out of fear that she would somehow violate a work rule. As a result of the stress, she began to have neck spasms and difficulty breathing.

13

While Smith was on duty on January 16, 2008, every time she entered a room, the other firefighters would leave and slam the door. Distraught, Smith asked if she could go home early because she was not in an emotional state to carry out her duties. Smith testified that Grace told her, "Sure, after you scrub the toilets and make sure you get all the urine off the wall or you're going to do it again." Smith cleaned the toilets and wall in tears while male firefighters stood and watched her.[4]

That same day, Volusia County Medical Director Dr. Peter Springer suspended Smith's ability to work as a paramedic, based on Deputy Chief McCallister's representations and his own investigation of the accident on August 22, until she completed three remedial requirements. Dr. Springer described these requirements as serious but "not onerous."

Two days later, on January 18, 2008, Chief Hawver made the decision to suspend Smith indefinitely without pay and forbade her from the premises of the fire stations. A male firefighter later testified that he had been suspended and ultimately terminated but was not similarly barred from fire-department premises.

The letter notifying Smith of her suspension included the results of Deputy Chief McCallister's investigation and Dr. Springer's findings and stated that the minimum requirement for the position of firefighter with the City was an EMT

---

[4] The firefighters shared a bathroom; there were not separate facilities for women.

certificate and that she "must present a valid E.M.T. Certificate in order to be considered for active status." Smith was still certified to work as an EMT. When she tried to present her EMT certificate to get back on active duty, she was not permitted onto fire-department premises to do so. Smith also sent copies of her EMT certificate to HR Director Hargy and the president of the firefighters' union, and she informed fire-department management about her active EMT status.

Smith completed two of the three requirements listed by Dr. Springer. But the City did not allow her to complete the third requirement. It refused to admit her onto City property to use the equipment necessary to complete the third requirement, to borrow the equipment to use it elsewhere, or to authorize Dr. Springer to clear Smith. Smith later learned that Deputy Chief McCallister had reported her to the Department of Health based on the August 22 incident. The Department dismissed the case.

On January 31, 2008, Chief Hawver recommended Smith's termination to City Manager Hagood. Smith ultimately was terminated, at which point she filed a Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC").

Smith appealed her termination through a union grievance procedure, resulting in an arbitration decision finding that the City had "just cause" to

terminate her based on the findings from the investigation into the August 22 incident.

## II.  Procedural History

Smith brought suit under Title VII and the FCRA against the City in July 2011 in the United States District Court for the Middle District of Florida.  She alleged that she was discriminated against on the basis of sex—by being suspended and terminated and subjected to a hostile working environment—and retaliated against for complaining about sex discrimination.  The district court denied the City's motion for summary judgment and allowed the claims to proceed to trial.

Pretrial, the parties addressed jury instructions with respect to back-pay damages and Smith's retaliation claim.  Regarding back pay, Smith argued that the district court should remove the words "net lost wages" from the pattern jury instructions because such an instruction would effectively result in Smith's being taxed twice on any award of lost wages.  The district court overruled Smith's objection.  Regarding retaliation, the City proposed the pattern instruction in the Eleventh Circuit.  At trial, Smith objected to the retaliation instruction, arguing that it contained "mixed-motive" language that may not be good law in light of the Supreme Court's opinion in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167,

129 S. Ct. 2343 (2009).[5]  The City did not object to the instruction, and the district court overruled Smith's objection.  The parties also agreed that the back-pay determination would be made by the jury.

After the district court reserved ruling on the City's motion for judgment as a matter of law under Rule 50(a), Fed. R. Civ. P., the City presented its defense. The City elicited testimony from Lieutenants Ofide and Grace, HR Director Hargy, Battalion Chief Wofford, Deputy Chief McCallister, Dr. Springer, and Smith. Ofide, Grace, and Wofford largely presented differing versions of the events described above.  Hargy testified that Smith had not made any complaints to her until after the August 22 incident and that she had investigated the no-tampon rule and found that it was different than presented by Smith.  She also testified on cross-examination that the first sexual-harassment training the City held since she was hired took place on March 12, 2008.

McCallister testified about the August 22 incident and another incident involving male firefighters who were also charged with willful neglect but not fired, and he stated that he believed Smith never obtained her EMT license, which would have allowed her to continue working.  Dr. Springer testified about his

---

[5] *Gross* held that a plaintiff must show that her age was a "but-for" cause of an adverse action to establish a violation of the Age Discrimination in Employment Act ("ADEA").  The decision in *Gross* was based on the fact that the ADEA, like the Title VII retaliation provision, does not provide that a plaintiff can prevail by showing that a protected characteristic was a "motivating factor" for the decision, which is the more liberal standard applicable to Title VII disparate treatment claims. *See Gross*, 557 U.S. at 173-78, 129 S. Ct. at 2349-51.

report of the August 22 incident and his conclusion that Smith performed substandardly by failing to assess properly the severity of the injuries of the man in the truck. He testified on cross-examination that he did not recommend her termination, thought she was a good paramedic aside from the incident, and would have cleared her to return to work if the City had authorized him to do so.

The City also wished to admit into evidence the arbitration-award finding that it had just cause for Smith's termination. The district court noted that it was concerned about the prejudicial effect of the arbitration award because it had the imprimatur of being a judicial or quasi-judicial determination, but it did not result from a Title VII proceeding and was based on a different standard. Ultimately, the court excluded the arbitration award in its entirety, finding that it was not possible to introduce the award in a way that did not risk the jury's being misled or conforming of its judgment to the arbitrator's.

After a six-day trial, a federal jury returned a verdict in favor of Smith on all of her claims and awarded $244,000 for back pay and $200,000 for pain and suffering. The district court also granted Smith's post-verdict motion for reinstatement and ordered the City to institute anti-discrimination training.

Post-judgment, the City filed a motion for judgment as a matter of law under Rule 50(b), Fed. R. Civ. P., arguing that the evidence was legally insufficient to support Smith's claims. The City alternatively moved for a new trial. The district

court denied the City's motion, finding the evidence sufficient for a reasonable jury to find in favor of Smith on her claims. The court also rejected the City's other challenges to the court's refusal to admit the arbitration award and to the jury instructions on the retaliation causation standard. These appeals followed.

THE CITY'S APPEAL

## I. Sufficiency of the Evidence

We review the denial of a motion for judgment as a matter of law *de novo*, applying the same standards as the district court. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010). Judgment as a matter of law is appropriate only when "the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Id.* (citation, quotation marks, brackets, and ellipsis omitted). In making that determination, we review the entire record, but we draw all reasonable inferences in favor of the non-moving party and do not assume the jury's role of weighing the evidence or making credibility determinations. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110 (2010)). We will credit evidence supporting the moving party that is uncontradicted and unimpeached, at least if it comes from disinterested witnesses, but "we will disregard all evidence favorable to the moving party that the jury is not required to believe." *Lamonica v.*

*Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312 (11th Cir. 2013) (internal quotation marks omitted).

We review the denial of a motion for new trial for an abuse of discretion. *Id.* "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* at 1312-13 (quotation marks and brackets omitted).

A.    *Disparate Treatment*

Title VII and the FCRA prohibit certain employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."   42 U.S.C. § 2000e-2(a)(1); Fla. Stat. § 760.10(1)(a).[6]  A claim based on this statutory section is referred to as a disparate-treatment claim.  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*).

Disparate-treatment claims can take two forms:  (1) a "tangible employment action," such as a firing or demotion on the basis of a protected characteristic; or (2) a "hostile work environment" resulting in a change to "the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." *Id.* at 807 (quoting *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245

---

[6]  Sex discrimination claims under the FCRA are analyzed using the same standards as Title VII.  *DuChateau v. Camp, Dresser & McKee, Inc.*, 713 F.3d 1298, 1302 (11th Cir. 2013).

(11th Cir. 2004)).  In this case, Smith proceeded under both theories of disparate treatment, which we address separately below.

Initially, we consider Smith's argument that our review of the City's renewed Rule 50(b) motion for judgment as a matter of law, with respect to Smith's disparate-treatment claims, is only for plain error because the City raised new grounds, such as Smith's failure to show that the City's reasons for terminating her were pretextual, not presented in the original Rule 50(a) motion. We have explained that a Rule 50(b) motion must be based upon the same grounds as the original Rule 50(a) motion because a Rule 50(b) motion is simply a renewal of the prior motion, *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004), although we have recognized that the issues raised need not be strictly identical, *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010).  Under the circumstances, we conclude that the City's argument in the Rule 50(a) motion adequately put Smith and the district court on notice of the evidentiary sufficiency issues it was raising, that the arguments later raised in the Rule 50(b) motion were closely related, and that any failures in specificity were excused by the district court's limitation of the amount of argument it heard on the Rule 50(a) motion. *See Howard*, 605 F.3d at 1243-44.  Accordingly, we review the denial of the City's Rule 50(b) motion with respect to the disparate treatment claims *de novo*.

1.      Tangible Employment Actions

A plaintiff can prevail on a Title VII disparate-treatment claim by demonstrating that her sex was "a motivating factor" for a particular adverse employment decision, even if the employer was also motivated by other, even legitimate, factors.  42 U.S.C. § 2000e-2(m).

We often evaluate Title VII claims based upon circumstantial evidence using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  The *McDonnell-Douglas* framework, however, is not the exclusive means of creating a triable issue of fact in an employment-discrimination case.[7]  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2001).  A plaintiff can also create a triable issue of fact concerning an employer's discriminatory intent by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733-34 (7th Cir. 2011)).  Various forms of evidence suffice to allow a reasonable

---

[7]  Moreover, both the Supreme Court and this Court have recognized that there is a point at which a trial has progressed too far to revisit the question of whether the plaintiff has established a prima facie case of discrimination under the *McDonnell-Douglas* framework, and, at that point, the focus shifts to the ultimate question of whether the plaintiff proved, "more probably than not, that the employer took an adverse employment action against [her] on the basis of a protected personal characteristic."  *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149-51 (11th Cir. 2005) (citation and quotation marks omitted).

inference that the employer fired the employee based on impermissible discrimination. *Id.* It is within this latter framework that the parties present their arguments on appeal.

The City argues that the evidence presented at trial was insufficient to allow the jury to reasonably infer that the City intentionally discriminated against Smith on the basis of her sex. The City relies on the Seventh Circuit's opinion in *Silverman* (cited by *Smith*, 644 F.3d at 1328), which broke down the "convincing mosaic" into three broad categories of circumstantial evidence: (1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and "other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification. Without opining on whether the *Silverman* considerations are the only relevant ones for satisfying the "convincing mosaic" standard, we conclude that each of the *Silverman* categories is satisfied here.

First, the City contends that the timing of the multiple investigations into Smith and disciplinary actions leading to her termination were not suspicious, that its reasons for terminating her were not ambiguous, and that Smith did not show

23

that other women were treated similarly.[8]  Assuming that the City's reasons were not ambiguous, the jury could have inferred that the timing of, and reason for, the second investigation into the August 22 incident was suspicious.  There was evidence that Deputy Chief McCallister harbored animus against Smith because of her sex, in view of his comments to Smith about her pregnancy and his indifference to her complaints of discrimination, and evidence that he initiated the investigation two days after Smith filed a grievance with the union complaining about the earlier investigations.  In addition, the record contains evidence that both Richenberg and Ryle, female firefighters, experienced treatment similar to that of Smith while employed by the City.  Specifically, Ryle testified that, as with Smith, work rules were applied differently to her than to male firefighters.

Other "bits and pieces" tending to show discriminatory intent include sexist and derogatory comments by superiors, such as Chief Deputy McCallister, Battalion Chief Coats, and Lieutenants Owens and Ofide; new rules based on gender, including the no-tampon rule and disallowing what the officers described as "girl magazines"; the lack of seriousness with which superiors took complaints of sex discrimination; and other aspects of the general atmosphere at the fire station, such as the presence of pornographic magazines for men, the placement of

---

[8]  The City challenges the evidence with respect to Smith's termination only, so we focus our analysis on that decision and deem abandoned any challenge to the other two decisions that the City acknowledged were adverse employment actions: Smith's suspensions for cursing and insubordination.

a Cosmopolitan magazine cover on Smith's Standard Operating Procedures Manual, the relative paucity of women firefighters, and the lack of any sexual-harassment training. In addition, Chief Hawver focused on Smith's gender during the job interview and later said that he was "not happy" when she became pregnant.

Second, Smith also presented sufficient evidence for the jury to conclude that she was "systematically treated" worse than similarly situated male firefighters. The City asserts that Smith did not present evidence of a similarly situated comparator outside of the protected class who was treated more favorably than she. But Smith presented evidence at trial that Lieutenant Kirsch, like Smith, was the lead paramedic on a three-person team that responded to a medical call and that Kirsch failed to comply with basic medical protocols. Viewing the evidence in the light most favorable to Smith, a reasonable jury could have inferred intentional discrimination from the fact that Kirsch, a male firefighter/paramedic, was charged with willful neglect of duty and received significant penalties, but unlike Smith, was not terminated or even suspended. Similarly, as to the charge of insubordination, Smith presented evidence that Dearwester, a male firefighter, was insubordinate to her during a medical call and acted in a "highly unprofessional" manner, but Dearwester did not receive a formal reprimand for

25

insubordination.  On the basis of similar conduct, Smith, on the other hand, received a 48-hour suspension without pay for insubordination.

Additionally, Smith testified that she was not allowed to change shifts, was denied proper gear, and was yelled at or disciplined in situations where male firefighters were not similarly reprimanded.  Lieutenant Ofide verbally reprimanded Smith for cursing, and she was written up for saying "kiss my ass," but numerous firefighters testified that male firefighters did not receive any disciplinary action for engaging in similar language.  During her suspension, the City instructed Smith that she could not return to the firehouse, but Farmer, a male firefighter, was permitted to go to the firehouse and have dinner following his termination.  Therefore, in evidence before the jury were numerous instances of situations in which Smith was treated worse than male firefighters.

Moreover, even if any of these comparators may not have been sufficiently similarly situated to permit comparison for Title VII purposes, the evidence was still enough to permit an inference of discrimination.  *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281-82 (11th Cir. 2008) (holding that the plaintiff established a prima facie case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient).

In addition, the jury could have inferred that the City's reasons for Smith's termination were pretextual.  The City justified Smith's suspension, which then led

to her termination, by stating that she was no longer qualified, but evidence at trial indicated that Smith could have continued working as a firefighter/EMT and that she presented her EMT license to the City.  Dr. Springer also testified that he would have cleared Smith to return to work as a paramedic if the City had allowed him to do so.  The City failed to provide any explanation for the refusal to allow Smith to complete the final performance requirement.

Relying on Dr. Springer's report, the City states that it terminated Smith based on her actions at the scene of the August 22, 2007, accident.  Assuming *arguendo* that the jury believed all of Dr. Springer's testimony that Smith performed deficiently on August 22, the jury still would have been permitted to infer that her termination was motivated by discriminatory intent based on sex.  Indeed, Dr. Springer explicitly testified that he did not recommend Smith's termination and thought that she was a good paramedic aside from the August 22 incident.  And, both Deputy Chief McCallister and Chief Hawver, who were the parties most involved in Smith's termination, had made comments demonstrating that they harbored antipathy against women.

The City also justified its termination decision on Smith's prior disciplinary record, which includes a charge of insubordination.  Yet the jury reasonably could have inferred that Smith's disciplinary record was the result of previous sex discrimination stemming from a workplace that was hostile to women.  For

27

instance, with respect to the insubordination charge resulting from the August 22 incident, Smith established that as the lead paramedic, she was in charge of making medical decisions, so the jury could have found that the insubordination charge was pretextual. And the jury quite clearly had grounds to believe that Coats, who sustained the charge, was motived by discriminatory intent. With respect to her suspension for cursing, numerous firefighters testified that no male had ever been punished for cursing, and the jury was entitled to believe that Smith was cursing at Kirsch rather than the administration. There was also evidence that the relevant decision makers had notice that these two suspensions may have been the product of sex discrimination, given that Smith met with HR Director Hargy and City Manager Hagood to complain about these investigations and the history of what she perceived to be sex discrimination at the fire department, and Hargy testified that she advised Chief Hawver about these complaints in December 2007, before Smith's suspension and termination.

Based on our review of the record, we conclude that Smith presented a "convincing mosaic" of circumstantial evidence by which a reasonable jury could have inferred that the City was motivated by discriminatory intent to suspend and ultimately terminate Smith. *See Smith*, 644 F.3d at 1328-29. Accordingly, the district court did not err in denying the City's motion for judgment as a matter of law on this issue.

2.    Hostile Work Environment

The City also argues that the evidence was insufficient with respect to the hostile work environment claim because many of Smith's complaints about alleged abusive or hostile conduct were not gender-specific, and the conduct that was gender-specific did not rise to the standard of "severe or pervasive."

To establish a hostile work environment claim under Title VII, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (citations and internal quotation marks omitted); *see Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). In a case alleging sex discrimination, the discriminatory conduct must be "gender-specific," as general vulgarity or harassment, however severe and pervasive, is not prohibited under Title VII unless it discriminates based on a protected category such as sex. *Reeves*, 594 F.3d at 809. "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Id.* at 813 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002 (1998)).

29

The requirement that the harassment be "severe or pervasive" contains an objective and a subjective component. *Miller*, 277 F.3d at 1276. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] . . . to be abusive." *Id.* (internal quotation marks omitted). The City does not challenge that Smith subjectively perceived the environment to be abusive.

"In evaluating the objective severity of the harassment, we consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. We evaluate the evidence of harassment both cumulatively and in the totality of the circumstances. *Reeves*, 594 F.3d at 808; *see Harris*, 510 U.S. at 23, 114 S. Ct. at 371.

With these principles in mind, and after reviewing the entirety of the evidence in the light most favorable to Smith, we hold that fair-minded jurors could reasonably have concluded that Smith's workplace was "sufficiently severe or pervasive" to alter the terms and conditions of her employment in a discriminatory way. *See Harris*, 510 U.S. at 21, 114 S. Ct. at 370; *Miller*, 277 F.3d at 1275. Reasonable jurors could have concluded that, based on the increasing

30

frequency and seriousness of the harassment up until the point of her termination, Smith endured an objectively hostile work environment to which male firefighters were not exposed. *See Reeves*, 594 F.3d at 813; *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1303-1304 (11th Cir. 2012) (discussing how the escalation of incidents towards the end of the plaintiff's employment created a jury question on the issue of severity and pervasiveness). Accordingly, the district court did not err in denying the City's motion for judgment as a matter of law.

From the beginning of her employment, when she was only the second woman to work at a fire department with between 39 and 51 employees, Smith, because of her gender, was subjected to an environment at the fire department that undermined her ability to perform as a firefighter. Numerous firefighters expressed their opinions that women were not fit for fire service and that they did not want to work with women. Smith's male superiors asked when she was going to get pregnant; Deputy Chief McCallister expressed the hope that Smith would become pregnant so that she could work as a secretary rather than a firefighter; and Smith lost certain job privileges after she did become pregnant. Smith was also subjected to derogatory comments based on her gender, including being called "split tail." When Smith brought up these issues, she was ignored, told that no one would come to her aid, or generally dissuaded from pursuing further action. Ryle also testified about the discriminatory work environment. *See Reeves*, 594 F.3d at

31

811 (stating that evidence of discrimination against other members of the protected group may give rise to an inference of discrimination). Moreover, in this day and age, in light of the other evidence presented, the jury was permitted to consider the nearly complete absence of women firefighter/paramedics from a department the size of New Smyrna Beach's as evidence of the inhospitable working conditions for women at that department. Indeed, it would certainly be reasonable to infer from this evidence that women were unwelcome, or, at best, barely tolerated, in the fire department.

Smith's final months of service culminated in actions that the jury could have found objectively humiliating and degrading, particularly when viewed cumulatively with the general atmosphere of hostility. *See Reeves*, 594 F.3d at 808 (harassment evidence is viewed cumulatively). The evidence shows that the frequency and severity of the harassment increased after Smith returned from her suspension in October 2007. According to Smith, male firefighters became more hostile at this time; the fire department instituted new, gender-specific rules, prohibiting so-called "girl magazines" and tampons, a basic feminine-hygiene item; and Smith was told her that she had "a big target on [her] back." Smith informed HR Director Hargy that sexual-harassment training was needed but was told, essentially, that it was not worth the cost. Concerned over the no-tampon rule, Smith also spoke directly with City Manager Hagood about whether she could

32

bring tampons to work but received no clarification about this private matter. That she even had to ask such a question about a basic feminine-hygiene item is embarrassing and outrageous. That the situation was not addressed is even more so. And, finally, while on duty on January 16, 2008, the other male firefighters left any room Smith entered and slammed the door. Distraught, Smith asked to leave work because she did not feel capable of performing her duties, and she was ordered to scrub the toilets and clean the urine off the wall before she left. She did so, in tears, while male firefighters watched her.

The harassing environment also affected Smith's ability to perform her job. When Smith complained to her union at the end of October about the discriminatory nature of the investigations resulting in her suspensions, she was subjected to additional investigations based on those complaints. Other complaints Smith made also triggered investigations. She testified that she was scared to put any complaints in writing for fear of retribution. And, when she responded to a paramedic call in December 2007, another male firefighter openly complained about and refused to follow her medical directions, and he was not punished.

The evidence was likewise sufficient for a jury to find that Smith suffered psychological injury as a result of the abusive environment. Smith testified that she developed anxiety and depression as a result of the alleged discriminatory conduct. Although psychological injury is not necessary to establish a hostile work

environment claim, it is relevant to the question of whether the environment is sufficiently severe or pervasive. *See Harris*, 510 U.S. at 21, 114 S. Ct. at 370 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct.").

With respect to the City's claim that Smith's evidence was primarily gender-neutral, the jury was permitted to infer that the actions against Smith were, in context, intended to discriminate against Smith on the basis of her gender. *See Oncale*, 523 U.S. at 81-82, 118 S. Ct. at 1003 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); *Reeves*, 594 F.3d at 810-11.

Assessing the conduct cumulatively and under the totality of the circumstances, Smith presented sufficient evidence for a reasonable jury to find that she was subjected to a hostile work environment. *See Harris*, 510 U.S. at 21, 114 S. Ct. at 370; *Miller*, 277 F.3d at 1276.

## C.    *Retaliation*

The City next contends that Smith failed to show that her protected activity was the but-for cause of her adverse employment action because she allegedly did not demonstrate any evidence of a retaliatory motive on behalf of either Chief Hawver or Hagood, the individuals who actually terminated her.

34

Title VII prohibits an employer from retaliating against individuals who informally voice complaints to their superiors or otherwise use their employer's grievance procedures regarding prohibited discrimination. *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989); *see* 42 U.S.C. § 2000e-3(a) (prohibiting discrimination by employers against an employee because an employee "has opposed any practice made an unlawful employment practice" by Title VII).[9]  A plaintiff may establish a retaliation claim showing that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). Here, the City challenges only the conclusion that the evidence of causation was insufficient.  As with Smith's discrimination claim, we proceed directly to the ultimate question of whether Smith was retaliated against because of her protected activity.  *Cf. Smith*, 644 F.3d at 1327-28; *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149-51 (11th Cir. 2005).

---

[9]  This is commonly referred to as the "opposition clause" of the Title VII retaliation provision, as opposed to the "participation clause," which requires participation in a more formal investigation or proceeding. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999).  The City raised only the participation clause in its Rule 50(a) motion, and, therefore, arguably waived review of its challenge to the retaliation claim on appeal other than for plain error. *See Howard*, 605 F.3d at 1243.  Nevertheless, we find that the City's arguments fail even under *de novo* review.

We previously have held that a plaintiff can satisfy the causation element by presenting sufficient evidence that the decision-maker was aware of the plaintiff's protected conduct, and a close proximity between this awareness and the adverse employment action existed. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). In 2013, the Supreme Court in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. ___, 133 S. Ct. 2517 (2013), held that a plaintiff must prove but-for causation—that the unlawful retaliation would not have occurred in the absence of the protected activity—to establish a claim of retaliation under Title VII. *Id.* at ___, 133 S. Ct. at 2533-34.

The City contends that the protected activity in this case was not causally related to Chief Hawver's and City Manager Hagood's decisions to suspend and then terminate Smith. Viewing the evidence in the light most favorable to Smith, however, we conclude that Smith presented sufficient evidence for a reasonable jury to find that the adverse employment action would not have occurred in the absence of the protected activity. Accordingly, the district court did not err in denying the City's motion for judgment as a matter of law on this basis.

Evidence was presented that Smith reported gender discrimination at the fire department to her superiors on numerous occasions. Indeed, early in her tenure, Smith complained to Deputy Chief McCallister about some initial difficult incidents with Coats, and McCallister warned Smith that filing a claim for a hostile

36

work environment would make her life much more difficult going forward. Put simply, Deputy Chief McCallister effectively cautioned Smith that engaging in protected activity would result in retaliation against her. And it did. In particular, in October 2007, Smith filed a grievance with her union about the investigations which led to her suspensions. She was written up based on the content of her grievance, and then soon after received notice that she was being investigated again in relation to the August 22 incident. At about the same time, Smith also was told that she had "a big target on [her] back." These investigations, by the City's own admission, eventually led to Smith's suspension and termination.

Significantly, Smith met with City Manager Hagood and HR Director Hargy in December 2007, recounting the entire history of harassment she had experienced at the fire department. Hargy testified that she informed Chief Hawver of Smith's complaints of discrimination in December 2007. During this same period, Hagood and Hawver made the decision to place Smith on suspension, prevented her from returning to work, and ultimately terminated her—purportedly based largely on the consequences of the investigation into Smith's performance during the August 22, 2007 incident. As explained above in the discussion of Smith's disparate treatment claims, however, there was more than enough evidence for the jury to find that the City's stated reasons for Smith's termination were pretextual.

37

Based on the strong temporal proximity between Smith's protected activity and the investigations and disciplinary activity that led to her eventual termination, as well as the evidence that the City's reasons were pretextual and McCallister's admission that a complaint about discrimination would lead to retaliation, a reasonable jury could have concluded that Smith would not have been terminated in the absence of her protected activity. *See Weeks*, 291 F.3d at 1311.

D.    *Motion for New Trial*

For the reasons that we have previously discussed, the evidence at trial was sufficient for a reasonable jury to find in favor of Smith as to her claims of disparate treatment, hostile work environment, and retaliation.  Based on our review of the evidence in this case, we also cannot conclude that the district court abused its discretion in denying the City's motion for a new trial on the basis that the jury's verdict was against the great weight of the evidence.  *See Lamonica*, 711 F.3d at 1312-13.

## II.  Arbitration Award

The City argues that the court should have admitted evidence of the existence of the arbitration decision upholding Smith's termination because it carried significant probative weight, and the risk of prejudice could have been minimized with limiting instructions.

We review evidentiary rulings under Rule 403 for abuse of discretion. *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992). We afford broad discretion to the district court's assessment of the probative value of the proffered evidence weighed against other factors counseling against admissibility. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384, 128 S. Ct. 1140, 1144-45 (2008). The district court did not abuse its discretion in excluding the arbitration award. The arbitration award had little, if any, probative value because the arbitrator applied a standard that is not easily relatable to the Title VII standard and did not discuss Smith's sex. Furthermore, the City presented evidence at trial that it used to argue that its bases for taking disciplinary action against Smith were justified, so the arbitration award itself would have been cumulative of this evidence.

Moreover, there was significant risk of unfair prejudice and jury confusion in admitting the award. As the district court noted, if the arbitration award had been admitted, the jury may have attempted to conform its decision to the arbitrator's, despite the differing standard and issues. The district court's reasoned decision to exclude the arbitration award in its entirety in this case was not an abuse of discretion. *See Mendelsohn*, 552 U.S. at 384, 128 S. Ct. at 1144-45.

### III.  Jury Instructions

The City argues that the district court's instruction on the causal element of Smith's retaliation claim improperly allowed the jury to find in favor of Smith under a lesser standard than but-for causation, as required by *Nasser*, and thereby prejudiced the City's defense.

We ordinarily review statements of law in jury instructions *de novo*. *Carlson v. United States*, 754 F.3d 1223, 1226 (11th Cir. 2014).  Although review is *de novo*, the standard is deferential, and we will reverse only "where we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."  *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 585 (11th Cir.2013) (quotation marks omitted).  When a party fails to object to the jury instruction it challenges on appeal, though, we review for plain error only.  *See Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir. 2001).  And when a party invites an error by requesting the substance of a given instruction, we generally will not review any claim of error on appeal.  *Id.* at 677.

In *Nassar*, the Supreme Court held that Title VII retaliation claims required proof of but-for causation.  570 U.S. at ___, 133 S.Ct. at 2533-34 ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").

40

Having requested the incorrect jury instruction given by the district court, the City may not now seek reversal on this basis. Although the City had a non-futile basis for requesting an instruction that strictly and expressly required but-for causation, specifically the Supreme Court's decision in *Green*, the City did not object to the pattern instruction that it had proposed. As in *Maiz*, we decline to carve out an exception to the invited-error doctrine, despite the intervening change in the governing law. *See Maiz*, 253 F.3d at 676-77.

In any case, even assuming that this issue were properly before us for review, the City has not shown that it was prejudiced by the asserted deficiencies in the pattern instruction. Specifically, the jury verdict form asked, "Do you find from a preponderance of the evidence that the plaintiff would have been discharged or otherwise adversely affected for other reasons even in the absence of this statutorily protected activity?" and the jury answered, "No." Therefore, the jury affirmatively found that the protected activity was a but-for cause of the adverse employment action, so any error in the instructions was harmless. *See State Farm Fire & Cas. Co.*, 739 F.3d at 585.

### SMITH'S CROSS-APPEAL

On cross-appeal, Smith argues that the district court erred in instructing the jury that it could award Smith "net lost wages and benefits," as opposed to instructing the jury that a damages award would undercompensate her because it

41

would be further reduced by the amount of taxes taken out of the award.  The Supreme Court has held that Title VII back-wages awards are taxable as ordinary income, according to Smith, and by instructing the jury as it did, the district court left her less than whole while rewarding the losing party.

Under Title VII, a defendant who engages in unlawful employment discrimination may be held liable for back pay, which is to be reduced by "[i]nterim earning or amounts earnable with reasonable diligence by the person or persons discriminated against."  42 U.S.C. § 2000e-5(g)(1).

The district court did not err in using the pattern jury instruction that included the phrase "net lost wages" because the instruction was a correct statement of the law.  The statute that authorizes the payment of back-wages defines back-pay as the earnings denied as a result of the unlawful employment practice less any amounts that the plaintiff actually earned or could have earned through reasonable diligence.  *See id.*  Thus, in this context, the amount of earnings denied less any amounts earned or that reasonably could have been earned in the interim represents the plaintiff's "net" earnings.  Smith misunderstood "net" to refer to the net amount of earnings as reduced by taxes, but this interpretation is unsupported by the statute.  *See id.*

So to the extent that the jury awarded Smith less based on taxes that she would have paid on her earnings, it did so because Smith's counsel specifically

42

calculated her damages for the jury at around $244,000. We find it difficult in these circumstances to say that Smith was prejudiced by the instruction. Nor does the jury instruction appear to preclude Smith from requesting the wages that she would have earned before taxation. Consequently, because the jury instruction itself was correct and did not misstate the law or mislead the jury, giving the instruction was not error. *See State Farm Fire & Cas. Co.*, 739 F.3d at 585.

## CONCLUSION

In sum, with respect to the City's appeal, we affirm the district court's denial of the City's motion for judgment as a matter of law and alternative motion for a new trial on all claims, the court's refusal to admit the arbitration award, and the court's giving of the retaliation instruction. With respect to Smith's cross-appeal, we affirm the district court's giving of the lost wages instruction.

**AFFIRMED.**